COSMOS EXPLORATION CO. v. GRAY EAGLE OIL CO. et al.

PACIFIC LAND & IMPROVEMENT CO. v. ELWOOD OIL CO. et al.

(Circuit Court, S. D. California. September 24, 1900.)

1. EQUITY—RIGHT TO PRELIMINARY RELIEF.

   A court of equity will not deprive a defendant of property in his possession on a preliminary hearing, either by the granting of an injunction or the appointment of a receiver, unless strong and clear equities are shown in behalf of the complainant.

2. PUBLIC LANDS—EQUITABLE RELIEF TO CLAIMANT—FRAUDULENT ENTRY.

   A claimant of land entered under Act June 4, 1897 (30 Stat. 36), in lieu of land situated within a forest reservation, on an affidavit stating its nonmineral character, that it was free from mining claims, and was entered for agricultural purposes, will not be granted relief in equity against another claimant in possession under an oil placer mining location, made prior to such entry, and followed up by development work, which was being prosecuted on the land when the entry was made, and resulted in valuable producing wells, where the affidavit of the entryman was also false in other particulars, the land being valueless for agricultural or grazing purposes, but situated in an oil district, and the entry being in fact made because of its supposed value for oil, although no discovery of oil had then been made thereon.

3. SAME—JURISDICTION OF COURTS.

   A court is without jurisdiction to entertain a suit to determine the rights of the parties in land the title to which remains in the United States, and in regard to which a contest between the parties is still pending in the land department.

4. SAME.

   A court cannot take jurisdiction in such case on an allegation that the protests filed against complainant's entry in the land office were insuf-

ficient to warrant the ordering of a hearing, that being a matter for determination by the land department.

5. SAME—EXCHANGE UNDER FOREST RESERVATION ACT.

Under the provisions of Act June 4, 1897 (30 Stat. 36), permitting an owner of land situated within the limits of a forest reservation to relinquish the same, and select in lieu thereof a tract of vacant land open to settlement of equal area, and the regulations of the land department to carry out the same, which require the officers of the local land office to forward all applications for a change of entry thereunder to the general land office for consideration, the applicant acquires no vested right in the land selected, for the protection of which he can maintain a suit in the courts, until his selection has been approved by the department, and especially when objections have been filed pursuant to such regulations and are still undisposed of.

6. SAME.

Since the act of March 3, 1891 (26 Stat. 1095), repealing the pre-emption law, and thereby eliminating from the homestead law the language incorporated therein by reference which exempted from entry "lands in which are situated any known salines or mines," entries under the homstead law, and, that being the only law under which land is "open to settlement" for agricultural purposes, selections made as forest reserve lieu lands, under Act June 4, 1897, are subject to the broader provision of Rev. St. § 2302, that no "mineral lands shall be liable to entry and settlement under its provisions," and the actual character of lands entered or selected is a question of fact to be determined by the land department, by applying the rule that they are to be considered mineral or nonmineral according to the use for which they are the more valuable.

In Equity. Suits to quiet title to lands. On motions for preliminary injunctions and for the appointment of receivers, and on demurrers to the bills.

Jefferson Chandler, Shirley C. Ward, J. W. Swanwick, and T. C. Van Ness, for complainants.

C. Linkenbach, J. S. Chapman, Everts & Ewing, Bicknell, Gibson & Trask, Flint & Barker, Geo. W. Baker, and Frank H. Short, for defendants.

ROSS, Circuit Judge. These cases were heard together, and may be so considered and determined, as the principal questions involved are common to them both. In that of the Cosmos Exploration Company the lands involved constitute the fractional W. $\frac{1}{2}$ of section 30, in township 28 S., range 28 E., Mt. Diablo base and meridian; and the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of section 4, in township 29 S., range 28 E., same base and meridian, constitutes the property in controversy in the case brought by the Pacific Land & Improvement Company. Each is a suit in equity; in the one first mentioned the complainant claiming to be the equitable owner of an undivided three-fourths of the lands there in question, and in the other the complainant claiming to be the equitable owner of the whole of the lands in controversy. In each the complainant seeks a decree quieting the alleged title as against the defendants to the suit. In each the defendants to the bills are alleged to be in the possession of the property in controversy, and to be extracting therefrom large quantities of oil, and each bill includes a prayer for an injunction restraining the defendants thereto from extracting any of the oil in the land, and also for the appointment of a receiver to take posses-

sion of the property and conserve it pending the litigation. Upon the filing of the respective bills, orders were made on the defendants to show cause why the preliminary relief asked should not be granted. The defendants appeared by counsel, and to each bill demurrers were filed, as also verified answers, and upon the orders to show cause a large number of affidavits were filed by and on behalf of the respective parties. The demurrers and orders to show cause came on for hearing, and were heard together; the verified answers being also used as affidavits. In each case the title claimed by the complainant is alleged to have been acquired by virtue of a selection made by its predecessor in interest under and by virtue of the àct of congress of June 4, 1897, entitled "An act making appropriations for sundry civil expenses of the government· for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," which contains, among other things, various provisions in respect to forest reservations, commencing with the declaration that "no public forest reservation shall be established, except to improve and protect the forest within the reservation or for the purpose of securing favorable conditions of water flows and to furnish a continuous supply of timber for the use and necessities of the citizens of the United States; but it is not the purpose or intent of these provisions, or of the act providing for such reservations, to authorize the inclusion therein of lands more valuable for the mineral therein or for agricultural purposes than for forest purposes"; and including this provision:

"That in cases in which a tract covered by an unperfected bona fide claim, or by a patent, is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the government and may select in lieu thereof a tract of vacant land, open to settlement, not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected: provided, further, that in cases of unperfected claims the requirements of the laws respecting settlement, residence, improvements and so forth are complied with on the new claims, credit being allowed for the time spent on the relinquished claims." 30 Stat. 11, 35, 36.

In the suit brought by the Cosmos Exploration Company the bill alleges that on the 16th day of November, 1899, one C. W. Clarke was the owner in fee simple, free of any incumbrance, of a tract of 165.35 acres of nonmineral land situated within the limits of a public forest reservation, for which a patent had been issued to him by the United States; that on the 9th (evidently intended to be the 8th) day of December, 1899, lots 1 and 2 of the S. W. ¼ of section 30, in township 28 S., range 28 E., Mt. Diablo base and meridian, containing 165.35 acres of land and no more, were, and for more than one year continuously theretofore had been, a tract of surveyed, unappropriated, and vacant public land of the United States, open to settlement, and returned and characterized upon the official records of the United States as "agricultural land," and did not then contain any known mines, known salines, or known minerals of any kind, nor had any petroleum or other mineral substances of any kind ever been discovered within the limits thereof; that, on the said 16th day of November, Clarke, being

desirous of availing himself of the above-mentioned act of congress, relinquished to the United States the tract for which he held its patent by conveying the same by deed to the United States, and recorded the deed in the office of the county recorder of the county in which the land was situated, and on the 8th day of December, 1899, delivered to the register and receiver of the United States land office at Visalia, Cal., his said deed, indorsed as so recorded, together with a full and correct abstract of his title to the relinquished tract, duly certified by the county recorder of the county in which the land was situated, showing him to be the owner thereof by title in fee simple, free of incumbrance, at the time of such relinquishment, and also a nonmineral affidavit, together with his selection of lots 1 and 2 above described in lieu thereof; that the register and receiver of the local land office thereupon, to wit, on the 8th day of December, 1899, duly accepted, received, and filed the deed, abstract of title, nonmineral affidavit, and selection of the said Clarke, and duly entered such selection upon the official records of the office, and that the register did then and there certify that the land so selected was free from conflict, and that there was no adverse filing, entry, or claim thereto; that on the 16th day of November, 1899, Clarke was the owner in fee simple, free of any incumbrance, of a tract of 165.17 acres of nonmineral land within the limits of a public forest reservation, for which the United States had issued to him its patent; that on the 8th day of December, 1899, lots 1 and 2 of the N. W. ¼ of said section 30, containing 165.17 acres of land and no more, were, and for more than one year continuously theretofore had been, a tract of surveyed, unappropriated, and vacant public land of the United States, open to settlement, and returned and characterized upon the official records of the United States as agricultural land, and did not then contain any known mines, known salines, or known minerals of any kind, nor had any petroleum or other mineral substances of any kind ever been discovered within the limits thereof; that on the said 16th day of November the said Clarke, desiring to avail himself of the provisions of the act of congress of June 4, 1897, relinquished all of the 165.17-acre tract so owned by him to the United States, free of incumbrance, by deed of conveyance, which deed he recorded in the office of the county recorder of the county in which the land was situated, and on the 8th day of December, 1899, delivered to the register and receiver of the land office at Visalia, Cal., the said deed, indorsed as so recorded, together with a nonmineral affidavit, and a full and correct abstract of his title to the relinquished tract, duly certified as such by the county recorder of the county in which the tract was situated, showing him to be the owner thereof in fee, free of incumbrance, together with his selection of lots 1 and 2 of the N. W. ¼ of said section 30, and that thereupon, to wit, on the 8th day of December, 1899, the register and receiver of the local land office duly accepted, received, and filed the deed, abstract of title, nonmineral affidavit, and selection of the said Clarke, and duly entered such selection upon the official records of the office, and that the register did then and there certify that the lands so selected, containing 165.17 acres, were free from conflict, and that there was no ad-

verse filing, entry, or claim thereto; that the tracts so selected by the said Clarke are situated in Kern county, Cal., and within the district of lands subject to sale and disposition by the United States at its Visalia land office, and are contiguous, and constitute one body of land, and together are known as the fractional W. ½ of said section 30; that on the 13th day of January, 1900, the said Clarke, believing there might be a possible defect in the title to the forest reserve lands relinquished by him to the United States, and used as a basis for the selection of the fractional W. ½ of said section 30, filed in the land office at Visalia two amended selections, under the act of June 4, 1897, in one of which he selected lots 1 and 2 of the N. W. ¼ of said section 30, containing 165.17 acres, and in the other lots 1 and 2 of the S. W. ¼ of the same section, containing 165.35 acres, in which amended selections he substituted instead of the lands formerly designated as a basis for such selections other nonmineral lands lying within a public forest reservation of the United States of equal area, to which the said Clarke had perfect title at the time of conveying the same to the United States, which conveyance was made by the said Clarke to the United States on the 4th day of November, 1899, and duly recorded in the office of the county recorder of the county in which the lands were situated, and which amended selections were accompanied by an abstract of title prepared by the county recorder of the county, showing that perfect title to such surrendered lands was vested in the said Clarke at the date of his deed therefor to the United States, and showing that by virtue of such deed the United States acquired perfect title to such surrendered lands, and that such amended selections were accompanied by nonmineral affidavits showing that the selected tracts contained no known minerals at the date of such amended selections; that the deeds of said Clarke for the tracts relinquished to the United States as a basis for such amended selections had prior thereto been filed with the register and receiver of the land office at Visalia, and were then on file in such office; that the officers of the local land office accepted such amended selections, and entered the same on the books of the office as amendatory of the former selections made by the said Clarke of the same lands upon December 8, 1899; that upon the said 13th day of January, 1900, said lots 1 and 2 of the S. W. ¼, and said lots 1 and 2 of the N. W. ¼, of said section 30, were, and for more than one year continuously theretofore had been, tracts of surveyed, unappropriated, and vacant public land of the United States (save in so far as the same were affected by the prior selections made by the said Clarke), open to settlement, and returned and characterized upon the official records of the United States as agricultural lands, and did not then contain any known mines, known salines, or known minerals of any kind, nor had any petroleum or other mineral substances ever been discovered within the limits thereof, and that on the 9th day of July, 1900, the said Clarke, by an instrument in writing, sold and conveyed an undivided three-fourths interest in the said fractional W. ½ of said section 30 to the complainant, who ever since has been the owner thereof. Clarke was made one of the defendants to the bill in the suit brought by the Cosmos Exploration Company for the reason, as alleged therein, that he would

not join in the bill as complainant. The bill in that case further alleges that the defendants thereto, other than Clarke, base their rights and claims to the lands there in controversy upon some one or more of four certain pretended placer mining locations, the first purporting to cover the S. W. ¼ of said section 30, and known as "Luck No. 4 Oil Placer Mining Claim," made on the 2d day of June, 1899, under the mining laws of the United States, by eight named persons; the second purporting to cover the N. W. ¼ of said section 30, made on the same day by the same persons, and called the "Luck No. 3 Oil Placer Mining Claim"; the third purporting to cover "a portion of the fractional west half of lots 1 and 2 of the northwest quarter of section 30, township 28 south, range 28 east, M. D. B. & M., containing 5.17 acres," located on the 7th day of November, 1899, by W. H. Mallory, Sadie J. Mallory, Sarah Starkie, and Charles Starkie, under the name of the "Surplus No. 1 Placer Mining Claim"; and the fourth purporting to cover "the west one-half of lots 1 and 2 of the south-west quarter of section 30, township 28 south, range 28 east, M. D. B. & M., containing 5.35 acres," located November 7, 1899, by the same four persons, and called the "Surplus No. 2 Placer Mining Claim." The Cosmos Exploration Company's bill proceeds to allege the particulars in which it is claimed that each of those mining locations is invalid, one of which is the alleged fact that there was no discovery of any mineral within either of the claims until after the selections were made by Clarke under the act of congress of June 4, 1897, which, it is averred, thereupon entitled him to patents from the government for the selected tracts. Luck No. 3 and Luck No. 4 mining claims are each alleged to be invalid for the further reason that each of them embraces more than 160 acres of land, and also for the alleged reason that they were both located by the same eight persons, and upon the same date, and that such tracts are contiguous. Surplus No. 1 mining claim is also alleged to be invalid for the further reason that the same purports to be the W. ½ of lots 1 and 2, in the N. W. ¼ of said section 30, whereas the N. W. ¼ of said section is alleged to be divided into lots 1 and 2, the most easterly 80 acres thereof being alleged to be lot 1, and the most westerly 85.17 acres thereof being alleged to be lot 2; and Surplus No. 2 mining claim is alleged to be invalid for the further reason that the same is alleged to be described as the W. ½ of lots 1 and 2, in the S. W. ¼ of said section 30, whereas the said S. W. ¼ of said section is, according to the averments of the bill in the case brought by the Cosmos Exploration Company, divided into lots 1 and 2, the most easterly 80 acres thereof being alleged to be lot 1, and the most westerly 85.17 acres thereof being alleged to be lot 2. In neither bill is it alleged that the boundaries of the locations under which the defendants claim were not so marked that they could be readily traced on the ground.

The Pacific Land & Improvement Company's bill alleges, among other things, the selection by its predecessor in interest, one J. R. Johnston, on the 23d day of December, 1899, under the act of congress of June 4, 1897, of the E. ½ of the S. W. ¼ of section 4, in township 29 S., range 28 E., Mt. Diablo base and meridian, containing 80 acres of land and no more, in lieu of a tract of 80 acres of non-

mineral land included within the limits of a public forest reservation, for which the United States had issued to him a patent, and which the said Johnston, on the 20th day of December, 1899, under and pursuant to the provisions of the act of June 4, 1897, relinquished to the United States by the deed of conveyance recorded in the office of the county recorder of the county in which the land was situated, which deed Johnston duly delivered at the time of his selection on the 23d day of December, 1899, to the register and receiver of the land office at Visalia, Cal., within which district the selected land is situated, which deed, indorsed as recorded as aforesaid, the said Johnston at the time filed in the local land office, together with a full and correct abstract of his title to the relinquished tract, duly certified as such by the county recorder of the county in which the tract is situated, showing him to be the owner thereof in fee, free of any incumbrance, at the time of such relinquishment, together with his nonmineral affidavit, and together with his selection of the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of said section 4, in lieu of the tract relinquished; that on the said 23d day of December, 1899, the register and receiver of the local land office duly accepted and filed the deed, abstract of title, nonmineral affidavit, and selection of the said Johnston, and duly entered such selection upon the official records of the office, and the register did then and there certify that the tract so selected by Johnston was free from conflict, and that there was no adverse filing, entry, or claim thereto; that on the 11th day of April, 1900, Johnston conveyed the tract so selected, and all his right, title, and interest therein, to the complainant, who has ever since been the owner thereof; that the defendants to the suit base their right and claim to the tract in controversy upon a certain pretended placer mining location covering the S. W. $\frac{1}{4}$ of said section 4, alleged to have been made on the 11th day of June, 1899, under the mining laws of the United States, by eight named persons, whose interests the defendants claim to have acquired by mesne conveyances. It is alleged that that location was void for the reason that no discovery of oil or other mineral was made within its limits until after the selection by Johnston pursuant to the act of congress of June 4, 1897, and also for the reason that seven of the eight persons who located that mining claim also on the same day located, or attempted to locate, certain immediately adjoining and contiguous property as placer mining claims.

Both bills allege that, after the selections under which the respective complainants claim were made, certain of the defendants to the suits filed in the local land office at Visalia written verified protests against such selections, wherein it is alleged that the lands so selected were not subject to selection under the act of June 4, 1897, for the reason that the same was mineral land, and was included within the boundaries of a valid placer mining location. Each protest prayed that the commissioner of the general land office order a hearing to determine the mineral character of the land, and that the selection thereof under the act of June 4, 1897, be rejected and disapproved. Each bill alleges that such protests are pending before the commissioner of the general land office, and

that the time allowed by the rules and regulations prescribed by the land department for the filing of such protests has now elapsed, for which reason it is alleged that no amended protests can be filed in the land office. The bill in each case alleges that the protests so filed are, and that each of them is, insufficient to warrant or justify a hearing being ordered by the land department to re-establish or redetermine the character of the land selected, or to change its specification as fixed by the report of the surveyor general, for the reason that the protests do not, nor does either of them, show that there was any known mine, or any know salines, or any known or existing petroleum wells, or known petroleum deposits, on the selected land at the time of its selection showing the same to be more valuable for mining than for agricultural or other purposes.

To each bill demurrers were filed upon the grounds, among others, that this court is without jurisdiction of the subject-matter, and that the bills themselves are without equity. Verified answers were also filed to each bill, all of which put in issue each and every averment of the bills in respect to any and all interests of the complainants in the property in controversy, and all the allegations of the bills in respect to the invalidity of the mining locations therein mentioned, and in respect to any acceptance by the register or receiver of the local land office at Visalia of the selections under which the respective complainants claim.

The answer of the defendants Gray Eagle Oil Company, Timothy Spellacy, J. W. Woods, C. A. Canfield, and J. A. Chanslor to the bill of complaint of the Cosmos Exploration Company, for further and separate answer, alleges, among other things, that on the 2d day of June, 1899, J. M. Terrell, Lee Terrell, E. L. Terrell, T. L. Luck, S. F. Wells, T. A. Wells, W. H. Wells, and N. W. Wells, each of whom was then a citizen of the United States over the age of 21 years, and a resident of the state of California, located, as an association of persons, a part of the N. W. ¼ of section 30, township 28 S., range 28 E., Mt. Diablo base and meridian, under the name "Luck No. 3 Oil Placer Mining Claim," at the time so marking the boundaries thereof by monuments and stakes at each corner and at intermediate points as that the claim could be readily traced upon the ground, and posted on the claim a notice of location, describing its boundaries, and containing the names of the eight locators, and the name of the claim, a copy of which was duly recorded in the office of the county recorder of the county in which the land is situated; that at the time of the making of the location the land was public mineral land of the United States, and was unoccupied and unappropriated by any one; that prior to the time of the making of the location the locators discovered on the land sands and shale containing the residuum of petroleum and bituminous matters and strata of oil-bearing sands in such state and quantity as would lead any petroleum miner to make further development thereof, and did lead the said locators and their successors in interest to make further development of the claim for the purpose of determining the full quantity of petroleum that may be found therein; that on making the said location the locators thereof took full possession of

the claim, and remained in open, quiet, and exclusive possession of the whole of it, and that they and their successors in interest have, since the 2d day of June, 1899, to the present time, caused four wells to be drilled thereon, all of which produced petroleum, and each of which but one, which was abandoned by reason of the collapse of the casing, has produced, and is still producing, it in large and profitable quantities; that since about the 1st of November, 1899, the work of drilling for oil thereon has been prosecuted continuously, and with due diligence and in good faith, by the successors in interest of the said locators, and that since about the 20th day of November, 1899, there has been a full-sized standard drilling rig at work upon the claim, and for a long time past there have been two standard drilling rigs at work thereon, and within the last three weeks three such rigs; that at the time the said land was, according to the averments of the bill, selected by the said C. W. Clarke, there was a full-sized derrick and drilling rig thereon, together with houses and buildings occupied by the defendants' employés,—all of which was known by the said Clarke at the time of his pretended selection, or could have been known to him if he had gone upon the premises; that subsequent to December 12, 1899, there was published, in a paper known as the "Visalia Delta," the following:

"Notice.

"United States Land Office, Visalia, Cal., December 12, 1899.

"To Whom It may Concern: Notice is hereby given that C. W. Clarke has filed in this office an application to select, under the act of June 4, 1897, the following tract, which is embraced in a township containing mineral claims of record, viz.: Lots 1 and 2 of N. W. ¼ of Sec. 30, T. 28 S., R. 28 E., M. D. M. A copy of said lists, so far as they relate to these tracts by descriptive subdivisions, has been conspicuously posted in this office for inspection by any person interested and the public generally. Within the next sixty days' following the date of this notice, under the departmental regulations of November 15, 1899, protests or contests against the claim of the said applicant to any of the tracts or subdivisions herein described, on the ground that the same is more valuable for mineral than for agricultural purposes, will be received and noted for report to the general land office at Washington, D. C. Failure to protest or contest the claim of the said applicant to said lands within the time specified will be considered sufficient evidence of their nonmineral character, and selections being otherwise free from objections will be recommended for approval.                                    Geo. W. Stewart, Register.
                                           "O. Scriber, Receiver."

That pursuant to that notice the defendant Gray Eagle Oil Company, then being the owner of said Luck No. 3 oil placer mining claim, made protest against the application of Clarke, which protest bears date February 9, 1900, and was filed in the local land office and noted upon the books thereof on that day or the next, and which protest sets forth fully the work and development that had been done by the Gray Eagle Oil Company and its predecessors in interest, and all the facts concerning the making of the said mining location, and showed its validity, and accompanied the protest with numerous affidavits showing that the said Gray Eagle Oil Company and its predecessors in interest had drilled oil wells upon the said claim, and that petroleum had been found therein in paying quantities, and that the said Gray Eagle Oil Company and its predecessors

in interest have continuously worked and developed the said mining claim since the date of its location, on June 2, 1899; that such protest, and affidavits accompanying the same, also showed that the land covered by the said mining claim was high, dry, sandy, and desert land, absolutely unsuitable either for grazing or agricultural purposes, and of no value for any other purpose than for the petroleum that it contains,—all of which, the protest and affidavits showed, the said Clarke well knew at the time that he made his application for the said land; that the said protest was duly filed in the office of the register and receiver of the land office at Visalia long prior to the expiration of the 60 days mentioned in the notice set out, and that the said register and receiver duly noted the filing thereof, and carefully considered the same, and forwarded the protest to the general land office at Washington, D. C., with recommendations that a hearing be ordered as prayed for therein.

Similar answers were filed to the bill of the Cosmos Exploration Company by the defendants Burton E. Green and M. H. Whittier, and by the Mt. Diablo Oil Mining & Development Company, W. T. Sesnon, W. E. Knowles, and A. J. Samuels, except that, in the answer of Green and Whittier, the mining location under which they claim embraces a part of the S. W. $\frac{1}{4}$ of said section 30, and is known as "Luck No. 4 Oil Placer Mining Claim," and except that in their answer it is alleged that their predecessor in interest, the Gray Eagle Oil Company, which was the successor in interest of the original locators of the claim, commenced the work to drill an oil well thereon with a standard drilling rig on the 28th day of November, 1899, hauling thereon the necessary lumber and other material, and that soon thereafter a full-sized drilling rig was put at work upon that claim, and that the work of boring and drilling for oil has been prosecuted thereon continuously, and with all possible diligence, ever since, and that the well has produced oil in large quantities for many months last past; and in the answer of the Mt. Diablo Oil Mining & Development Company, W. T. Sesnon, W. E. Knowles, and A. J. Samuels the mining location under which they claim is alleged to embrace the excess of the N. W. and S. W. quarters of the aforesaid section 30 over the regular acreage of such quarter sections, and is alleged to be known as the "Lexington No. 5 Placer Mining Claim," and to contain 10.52 acres, and except that in this answer it is alleged that the location under which these defendants claim was made by one Milton McWhorter on the 3d day of November, 1899, from which time the said locator and these defendants, as his successors in interest, have been continuously in the open, quiet, and peaceable possession of the whole of said claim, and on or about the 1st day of December, 1899, commenced boring an oil well thereon, having theretofore placed the proper derrick and machinery therefor, which was being actually and diligently operated at the time of the selection under which the complainant in the suit claims.

I have not overlooked the statement in one of the briefs for the complainants to the effect that the answer of the Mt. Diablo Oil Mining & Development Company, W. T. Sesnon, W. E. Knowles, and

A. J. Samuels in effect admits that no protest or objection of any kind was filed in the land office contesting the right of Clarke to enter that portion of the lands described in the bill included within the limits of the Lexington No. 5 placer mining claim. In that statement, however, counsel are altogether mistaken. It is true that the bill of the Cosmos Exploration Company alleges that that portion of the lands in controversy is claimed by the defendants to have been located on the 7th day of November, 1899, by W. H. Mallory, Sadie Mallory, Sarah Starkie, and Charles Starkie, under the names, respectively, of "Surplus No. 1 Placer Mining Claim" and "Surplus No. 2 Placer Mining Claim"; but the bill expressly alleges that the complainant's predecessor in interest, C. W. Clarke, selected the entire fractional W. ½ of section 30, which includes that portion of the lands covered by the location under which the defendants Mt. Diablo Oil Mining & Development Company, W. T. Sesnon, W. E. Knowles, and A. J. Samuels claim, and that those selections were and are still being contested in the land office, not only by the defendant Gray Eagle Oil Company, but by W. H. Mallory, Sadie Mallory, Sarah Starkie, and Charles Starkie as well. It is true that the answer of the defendants Mt. Diablo Oil Mining & Development Company, W. T. Sesnon, W. E. Knowles, and A. J. Samuels denies that either of them claims under any mining claim named in the bill, but under a location called "Lexington No. 5 Placer Mining Claim," located by one McWhorter. The fact remains that the selection of the land under which the complainant claims, by whatever name called, is, according to the express averments of the bill, being contested in the United States land office.

The answer of the defendants to the bill of complaint of the Pacific Land & Improvement Company alleges, among other things, that on the 11th day of June, 1899, J. F. Elwood, H. M. Rogers, Frank R. Lindsey, D. S. Snodgrass, V. I. Willis, F. M. Garrison, A. B. Elmore, and George L. Hoxie, each then being a citizen of the United States over the age of 21 years, located, as an association of persons, under the mining laws of the United States, the S. W. ¼ of section 4, in township 29 S., of range 28 E., Mt. Diablo base and meridian, at the time marking the boundaries of the claim with monuments and stakes so placed at each corner thereof and at intermediate points as that the claim could be readily traced upon the ground, and posted a notice in writing thereon describing the said boundaries, and containing the names of the locators and the name of the claim and the witnesses to the posting, and on the 5th day of July, 1899, caused to be recorded a copy of the notice so posted in the office of the county recorder of the county in which the land is situate; that at the time of making the said location the land thereby embraced was public land of the United States, unoccupied and unappropriated by any one, and that prior to the making of the location the locators discovered thereon seepages of oil, and the residuum of petroleum and bituminous matter, and strata of oil-bearing sands, in such state and quantity as would lead any miner to locate such claim and make further developments, and did lead the said locators to do those things, for the purpose of determining

the full quantity of petroleum that might be found therein; that at the time of the making of the said location the locators thereof took full possession of the claim, and that they, and their grantees and successors in interest, have ever since remained in the open, quiet, and exclusive possession of the whole of the land described in the bill of the Pacific Land & Improvement Company, being the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of said section 4; that on or about July 1, and prior to July 3, 1899, the said locators proceeded to the exploration and further development of the claim, and did dig and cause to be opened up thereon a prospect and discovery shaft to a depth of 60 feet or thereabouts, in sinking which they discovered petroleum therein, thereby demonstrating the great value of the property for mining purposes, at which point they were for a time enjoined at the suit of certain adverse mineral claimants; that during the month of January, 1900, the successors in interest of the said locators placed a drilling plant on the said claim immediately adjacent to the above-mentioned shaft, and drilled a well which produced petroleum in large and valuable quantities; that at the time of the location of the said claim the land thereby embraced was dry and barren, and is so situated that it is impossible to bring water thereon for the purpose of irrigation, and is so rough that if water were brought thereon for that purpose it could not be used; that it is utterly worthless for the purposes of agriculture, is situated about five miles from the town of Bakersfield, and was surveyed by the United States about the year 1855, and was never claimed, appropriated, or entered by any person for any purpose until located for mineral purposes as already stated, and that the selection by Johnston of the said land, under which the complainant Pacific Land & Improvement Company claims, was falsely and fraudulently designed and intended only to acquire and possess the same for its mineral value, he well knowing that the said land was utterly worthless for any purpose of agriculture or grazing; that ever since the location of the said tract, on the 11th day of June, 1899, these defendants and their predecessors in interest have been in the quiet, peaceable, exclusive, and uninterrupted possession of the same, and have expended thereon, in the erection of houses, derricks, drilling outfits, engines, pumping stations, and other buildings and appliances for the operation of the property as a mining claim, more than $10,000; that the said Johnston, in making his said application for the said land, supported it with an affidavit required by the rules of the land department of the United States, whereby and wherein he falsely swore that said land was essentially agricultural, was nonmineral in character, was not occupied or claimed as a mining claim, and that he in good faith desired, designed, and intended to acquire the same for its agricultural value, and did not desire, design, or intend, under the guise or pretense of acquiring it as agricultural land, to acquire it for its mineral value,—all of which was false and fraudulent, and was at the time known by the said Johnston to be false and fraudulent.

All of these answers were used, as has been said, as affidavits on the hearing of the orders to show cause; and many other affida-

vits were filed by the defendants in support of the allegations contained in the answers, as also many affidavits on the part of the complainants in contradiction of many of the averments of fact made by the defendants. In respect to such conflict, the court would not, upon the mere preliminary hearing of motions for an injunction or for the appointment of a receiver, undertake to make a decisive determination. Even on such a hearing, however, unless the proof, taken as a whole, shows that the case of the complainants has a reasonable ground to rest upon, it is the duty of the court to deny the application for preliminary relief; for courts do not lightly enjoin parties from operating property in their possession, nor appoint receivers to take property out of their possession. Nevada Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 674; 20 Am. & Eng. Enc. Law, pp. 18, 21, and cases there cited. The fundamental question in every suit in equity is, on which side is justice? Law, unfortunately, is sometimes not justice; but equity always is,—so much so that in one of the townships within this judicial district the justice of the peace is understood to maintain on one page of his docket "The Justice's Court" of law, and on the opposite page a "Court of Justice," and to give to suitors before him the choice of forums. There may not be any law for such action on the part of that distinguished magistrate, but congress has constituted the circuit courts of the United States both courts of equity and courts of law, and all suits that are here brought on the equity side of the court must be governed and controlled by the eternal principles of right. The affidavits filed on behalf of the defendants to these suits, several of which are made by men holding positions of trust and confidence in the community in which they reside, corroborate the sworn statements in the answers of the defendants in respect to the actual and continuous possession by the locators and their successors in interest of the respective mining claims in controversy, and in respect to the actual and diligent working of those claims for oil at the very time when the selections under which the complainants claim were made. That those developments resulted in a large production of oil on each of the mining claims in controversy is not only not disputed by the complainants, but it is to preserve the oil in them, that the defendants and their predecessors in interest have disclosed and produced, that the complainants seek at the hands of this court a receiver or an injunction. The character of the affidavits filed on behalf of the complainants is far less satisfactory than those filed by and on the part of the defendants; for the latter are of positive, affirmative acts, such as the building of houses, the erection of derricks, the sinking of shafts, the drilling of holes, and other matters of like nature, about which there could not be any mistake, and were either true or the parties swearing to them committed willful and deliberate perjury. Moreover, the eagerness and activity with which lands in the Kern river field are shown to have been at that time sought, and their great value for oil, make it reasonable and natural to believe that those locating them for that purpose would not be slow to prosecute their development, nor careless in the matter of maintaining their possession. The affidavits

on the part of the complainants, although many in number, are generally to the effect that the affiants had been on and over the lands in controversy, had carefully examined their surface, and were familiar with them.    Some of the affiants state in positive terms that at the times mentioned the lands contained no evidences of oil or other mineral, and many of them state that the affiants saw no such evidences.    Some of them state in positive terms that the lands were unoccupied, without buildings, derricks, or other structures, and others that the affiants did not see any such improvements or evidences of possession.    Many of them state in positive terms that the lands were covered with a good growth of native grasses, and some of them state that such growth was luxuriant, and that they are good grazing lands.    When it is remembered that there are none so blind as those who do not wish to see, and the pregnant fact is also borne in mind that these now claimed agricultural lands were surveyed by the United States in or about the year 1854, and are situated within a few miles of the prosperous town of Bakersfield, some of them being within five miles thereof, and were never at any time, so far as appears, considered of sufficient value for agricultural or grazing purposes to be taken up by any one at the nominal price for such lands fixed by the government, until after the predecessors in interest of the defendants to these suits had located them under the mining laws of the United States, it ought not to be a difficult matter for any fair mind to determine on which side is the preponderance of proof disclosed by the affidavits, if this be a matter of preponderance of proof.    And when to all of this is added the sworn statements and admissions found in the affidavit of Mr. Ward, one of the counsel for the complainants in these suits, and one of the counsel for the complainant in the suit of Olive Land & Development Co. v. Olmstead, 103 Fed. 568, recently decided by this court, and hereinafter referred to, followed up by the nonmineral affidavits filed in the land office by and on behalf of the persons under whom the complainants assert title, the last vestige of ground for the appointment of a receiver or the granting of the injunction prayed for is swept away, if any such ground ever existed.  The very injuries alleged in the bills themselves as grounds for the preliminary relief asked are not injuries to any agricultural character of the lands in controversy, but the despoiling of their value by the extraction of the mineral oil they contain.  No mineral lands were authorized to be selected under the act of June 4, 1897, providing for the exchange of lands in certain cases, as we shall presently see.   Yet the affidavits leave no room for any sort of doubt that the parties making the selections under which the complainants assert title knew at the time they did so that the lands in question were valuable for the mineral that they contained, or, at least, were supposed to contain. and were sought for that purpose only, and were practically worthless for agriculture or for any other purpose than that of mining.   Take the sworn statements and admissions of Mr. Ward himself.   It appears that he was the attorney and adviser in the matters in question for Johnston, who made the selection under which the complainant Pacific Land & Improvement Com-

pany claims, and who made the selection under which the Olive Land & Development Company claimed in the suit heretofore and hereinafter referred to, and also represented other parties seeking to secure other oil lands in the immediate vicinity of those here in suit, under and by virtue of the forest reserve lieu land act. One Herbert G. Wylie was at the times in question the superintendent of the Petroleum Development Company, some of whose lands, or, at least, lands to which that company claimed title under the mining laws, had been selected under the forest reserve lieu land act by clients of Mr. Ward, although it is but fair to the latter to say that he swears explicitly that he did not know that fact at the time of sending to Wylie the telegram and letter next mentioned, or at the time of the interview held between them, and to which reference is made in Mr. Ward's affidavit. In the affidavit of Wylie he states that on or about January 14, 1900, he received a telegram from Mr. Ward, dated San Francisco, and in substance as follows: "Can you meet me at Southern Hotel to-morrow 5 o'clock? Confidential," to which he states he replied: "You can find me at the wells at any time;" and that subsequently he received from Mr. Ward a letter, of which the following is a copy:

"On Board South Bound Owl, June 17, 1900.

"Mr. H. G. Wiley, Bakersfield, Cal.—My Dear Sir: I have an exceedingly important matter which I wish to present to you bearing upon the oil land situation in the Kern river belt, & I hoped to have gotten to Bakersfield the other day when I telegraphed you from San Francisco, to have talked the matter over with you there, but urgent matters prevented my doing so, & I would stop now to see you, but urgent business requires that I be in Los Angeles to-morrow morning. What I have to say I believe means a handsome thing for you if you care to co-operate with me. Quick action is necessary to take advantage of the situation, & if you can spare a day away from the wells I wish you would come to Los Angeles on the train to-morrow night, the 18th inst., & see me the next morning, & if we do no business I will gladly pay the expenses of your trip. Please let me hear from you by that train anyway.          Yours, truly,                    Shirley C. Ward."

Wylie states in his affidavit that he came to Los Angeles at the time suggested in this letter, and had an interview with Mr. Ward the next morning in his office, during which Mr. Ward stated to him, among other things, that he wished him (Wylie) to act as a representative of three corporations, of which Mr. Ward was attorney, in the oil field in Kern county; that it was a question in his (Ward's) mind how he could obtain the quickest title to the oil lands in that field, and that when in San Francisco he consulted with other attorneys and parties, and that they had determined to place scrip upon the lands as being the quickest and easiest way to obtain title thereto. The affidavit of Wylie also contains certain propositions stated by him to have been at that time made to him by Mr. Ward, which I do not find it necessary to set out. In the affidavit of Mr. Ward he admits sending the telegram and letter to Wylie, and admits the interview in his office, his version of which is given in his affidavit as follows:

"That at the time said interview occurred affiant knew that said Wylie was in the employ of the Petroleum Development Company, and was super-

intendent of the field work thereof, which company was operating in the production and marketing of oil in the Kern river oil district, in Kern county, California, but affiant did not know at the time of such interview that the Petroleum Development Company either owned or leased, or claimed under mineral locations or otherwise, any of the lands which had been selected under the act of congress of June 4, 1897 (30 Stat. 36) by any of the clients of affiant, or by any parties represented in any way by affiant. That the sole purpose of such interview between affiant and said Wylie was to engage said Wylie to make frequent examinations of, and keep in close touch with, the lands which had theretofore been selected under the act of congress aforesaid by parties represented by affiant, in order that said Wylie might be advised instantly of any trespass upon such property, or any portion thereof, by any parties entering upon the same for the purpose of developing petroleum thereon or otherwise, and in order that said Wylie might secure evidence, as the same arose, of any entry that might be made upon such lands by any parties attempting to bore or drill thereon for petroleum, and in order that said Wylie might keep a constant record of the dates at which any of such entries were made, and of the parties by whom made, and that said Wylie might be advised in the event that any oil developments were had upon such lands and of the progress thereof, and the exact time at which, if ever, oil was discovered or found in any of such borings or wells, all to the end that said Wylie might keep affiant and the parties whom he represented as attorney at once and constantly advised of the movements that were made from time to time upon such lands, to the end that affiant would have a complete and perfect record of everything that transpired upon the lands already selected subsequent to the date of such interview, so that he might thereby be in position to refute and overcome any false showing of fact which the mineral claimants might at any time attempt to make as to the time they entered upon any of such selected lands, or the time at which they discovered oil thereon. That affiant was led to resort to such a means of having a complete record and a check upon all the movements that might thereafter occur upon the lands which had been selected by his clients because he was impressed with the danger of being overwhelmed with a multitude of false affidavits as to the time the first discoveries of oil upon said premises were made, in the event that any such discoveries should ever thereafter be made thereon; and affiant having heard that certain mineral claimants had stated that they could produce an oil discovery with a hydraulic rig in a single night, by boring a shallow hole and pouring oil in from above, and fearing that some such fraudulent practice might be resorted to, he felt the necessity of having some one, who was in touch with everything going on in the district, constantly on the watch to discover and expose any such fraudulent practice, if the same should be resorted to on any of the lands which his clients were interested in. That affiant realized that the outcome of such selections as had been made by his clients in said Kern river district depended upon being able to show truthfully and accurately to the court or to the land department the facts as they actually existed at the date of such selections, and that affiant realized the difficulty of presenting the truth to the court upon such questions where the sentiment existing in the community in which such lands were located was as strongly adverse to scrip titles and as strongly in favor of placer location titles as was the case in such community. That, realizing such difficulty, affiant sought to obtain the assistance of some one who was upon the ground, and in a position to know from day to day exactly what transpired upon the lands in which his clients were interested; and realizing the importance of being able to show the facts as they actually existed at the date of such selection, and realizing the absolute necessity of being able to expose and show the falsity of any perjured testimony concerning such matter, affiant wired and wrote to said H. G. Wylie as in the affidavit of said Wylie stated. That the statements contained in such affidavit of said Wylie, except in so far as they conform to the following statements of facts, are wholly untrue. Affiant alleges that the following was the purport of the conversation had between said affiant and said Wylie at the office of the affiant, upon January 20, 1900: Affiant stated to said Wylie that, as a result of his examination of the law and his consultation with other attorneys in San Francisco, he had, early

in December, 1899, come to the conclusion that there could be no valid mining location of lands supposed to be chiefly valuable for petroleum unless the same was based upon an actual discovery of oil upon the specific property, and that the actual discovery was the very basis of such a mining location; and that as there were no surface discoveries of oil in the Kern river district, except possibly the old Elwood discovery on section 3, down at the river bank, he had been trying to find a method by which good title could be acquired to such lands in the absence of, and prior to the actual discovery of, oil; and that early in December, 1899, he had come to the conclusion that good title could be acquired to such lands under the forest reserve lieu land act, and that having come to such conclusion, and advised some of his clients to that effect, they had already selected and entered under such act a large body of land scattered throughout the Kern river district, amounting to between two and three thousand acres. That such lands had been carefully examined by a number of witnesses before they were selected, and it was found beyond all question that the same were unoccupied, and that they contained no discoveries of oil or improvements whatsoever at the time of their selection. Affiant then stated to said Wylie that, notwithstanding such were the facts, the sentiment existing in the community at Bakersfield, as evidenced by the attempt at mob violence upon the persons of Mr. Stevens and Mr. Whitaker in the Alexander Case, was so strongly against the scrippers that affiant seriously feared that perjured testimony would be resorted to by the mineral claimants, in order to show that actual discoveries of oil had been made upon the lands selected by affiant's clients at the time of selection, and that as none of affiant's parties resided in Kern county, and had no representative there, affiant would like to employ him to keep tab on the situation, and keep a record of everything that was done upon such lands, so that he would be able to say exactly when, if ever, any parties entered thereupon for the purpose of boring for oil or otherwise, and exactly when, if ever, they discovered oil thereon, and all the facts concerning the same, together with corroborative evidence thereof, as affiant believed that said Wylie was in position to know everything that was going on in the way of oil development and exploration in that territory. Said Wylie told affiant at the time that he knew every driller in the field, and that every new rig that came in soon came in touch with him, because he furnished oil to run the engines of nearly all the drillers then working in the field. That he would be in position to advise affiant of everything just as it occurred, and that he could keep exact record of all borings, and inform affiant exactly when any one entered upon such land, so that affiant could take the action he saw fit, either in the way of injunction or otherwise. Said Wylie did not inform affiant at that time, nor until some months later, when he met affiant in the city of Los Angeles, that his employers were in any way interested in the land that had been selected by the clients of affiant. That affiant in no way referred to engaging said Wylie to aid him in making selections of land not already made, nor to obtain any information in any way that would be of value to affiant or to his clients in connection with lands yet to be selected under said act of congress; and affiant states as a fact that neither he nor any of his clients have since the said interview of said Wylie of January 20, 1900, made any selections of land in the said Kern river district, and further states that at the time of such interview they had no intention of making any further selections. That the proposed employment of said Wylie was solely for the purpose of enabling affiant and his clients to prove the truth as to the exact status of the lands which they had already selected, at all times after such interview, and until all controversy as to title thereto was finally settled; and the sole purpose of affiant's attempt to employ said Wylie was in order that he might know exactly when, if ever, any parties went upon the lands that had been selected by affiant's clients, and exactly when, if ever, any subsequent discoveries of oil were made thereon, and to thus be in a position to defeat any attempts that might be made to antedate such discoveries. That affiant did offer said Wylie the equivalent of an undivided 60 acres in the holdings of said Kern river district then controlled by clients of affiant, amounting to between 2,500 and 3,000 acres; but that such interest was to be represented, not in land, but in stock of corporations which would be organized to own and control such

property. That said Wylie led affiant to believe that such offer would be agreeable to him, provided the lands selected, upon examination, proved, in said Wylie's estimation, to be sufficiently valuable to make such compensation adequate for the service he was expected to render. That said Wylie left affiant with the understanding that he would examine the lands selected by affiant's clients as aforesaid, and that he would communicate with affiant his conclusion on the subject within a few days. That affiant expected to hear from said Wylie within a few days upon the subject, but said Wylie never communicated with affiant for several months thereafter, and, instead of treating as confidential the information which affiant had given said Wylie, affiant believes that said Wylie communicated affiant's information to the mineral claimants interested in, and claiming title to, the lands so selected by the clients of affiant as aforesaid. Affiant says it is not true that he ever stated to said Wylie that the corporations or companies which he represented had ten thousand dollars in cash, or any other sum in cash, for the purpose of scripping oil lands as the development thereof showed it to be of great value, or otherwise. That affiant in no way mentioned to said Wylie his intention of scripping any lands in addition to those which had already been scripped by his clients, as he had no such intention. Affiant says it is not true that he told said Wylie that he was to act clandestinely in the matter, or that he was to violate any confidential or fiduciary relations to any one; but affiant, supposing there was no conflict between the interests of the employers of said Wylie and affiant and his clients in connection with the lands which had been selected as aforesaid, affiant did not imagine that there would be any violation of the duty of said Wylie to his employers involved in the services which were called for by the employment proposed to said Wylie. Affiant says that it is not true that he proposed that said Wylie was to obtain leases upon oil lands, and was to proceed to develop the same, and that affiant and his associates would enjoin them, and that defendants would make no defense to such action, and that thereby a decision in favor of the persons placing the scrip upon said ground would be obtained. On the contrary, affiant states that no mention of any such matter was made between him and said Wylie. That the Alexander-Canfield Case was then pending in this court, which affiant expected would settle the law in such controversies. That the only matter discussed or proposed between him and said Wylie was the employment of said Wylie to secure information as to, and keep a record of, everything that transpired upon the lands already selected by the clients of affiant, and to secure corroborative evidence thereof, solely with the view of being able at all times to establish the exact truth as to developments or oil discoveries upon such lands subsequent to their selection by affiant's clients. That the chief purpose of affiant in his conference with said Wylie was the securing and preserving of evidence that would defeat perjury and falsification of the facts as affiant knew them to be at the time of such interview, and said interview was not in any way for the purpose of procuring information upon which affiant or his associates might act in making future selections of land under the act of congress aforesaid. That affiant is satisfied that said Wylie did not consider the proposition that was made by affiant to him either in the light of a bribe, or as an attempt to induce him to betray the interests of his employers, and is also satisfied that said Wylie did not regard the plan proposed by affiant as a conspiracy to unlawfully defraud any one, or as in any way illegitimate, and affiant is satisfied that the only reason that said Wylie did not accept the offer made him by affiant was that said Wylie, after taking the consensus of opinion among the mineral claimants in said district, had no confidence in the law being as claimed by affiant. In such conversation affiant asked said Wylie if the services that would be imposed upon him under this proposed employment would in any way conflict with his duties or obligations in his position as manager of the Petroleum Development Company. Said Wylie assured the affiant that, so far as he knew, there would be no possible conflict of interests, and affiant alleges that at the time of said interview he knew of no reason why said Wylie could not secure for him said information, and keep the record required, and that it was not until a long time thereafter that affiant learned that said Wylie's employers were in any way interested in any of the lands that had been selected by affiant's clients. That

affiant assumed that said Wylie was worthy of confidence, and would treat his conference as confidential, even if he did not accept his employment."

It is not necessary to here go into the question of veracity respecting the conflicting statements of the two affidavits, nor to inquire into the moral phase of the propositions made by Mr. Ward to Wylie, nor as to whether those propositions had reference to lands already selected, or to the ascertainment of lands to be selected in the future. The important point is that Mr. Ward's own affidavit discloses the fact that before any of these lands had been selected under the forest reserve lieu land act the question as to how to obtain them had been the subject, not only of his own meditations, but of consultations with his associates in San Francisco; that he knew that, to secure title to them under the laws which congress itself declares are the only ones that provide for the disposition of mineral lands, it would be necessary to make an actual discovery upon each claim; that what he sought to do, and that what was attempted by his clients, was the obtaining of title to these oil lands without complying with the mining laws of the United States, and by selecting them under the forest reserve lieu land act. If from the other affidavits in these cases there could exist any doubt that the parties under whom the complainants assert title made these selections of what they knew, or, at least, believed, to be oil lands for the very purpose of securing them by means unauthorized by law, and pursuant to a plan devised and settled in advance, it is shown beyond any question by the statements and admissions of Mr. Ward. And so, in pursuance of that plan, we find the lands here in controversy selected by the predecessors in interest of the complainants, and each of those selections accompanied and supported, in the one case by the affidavit of Johnston himself, and in the other by that of one G. W. Baker, on behalf of Clarke, in each of which the affiant swears that he is well acquainted with the character of the land selected, and that his personal knowledge thereof is such as to enable him to testify understandingly with regard thereto; that no portion of the land is claimed for mining purposes; that no portion of it is worked for mineral during any part of the year by any person or persons; that the land is essentially nonmineral land, and that his application therefor is not made for the purpose of fraudulently obtaining title to mineral land, but with the object of securing the same for agricultural purposes. If, instead of these palpably false and fraudulent statements, the affidavits accompanying and in support of the selections had stated the truth,—had stated that the applicants at least believed the lands sought contained oil, and that they wanted them for that purpose, and for that purpose only, and desired to select them under the law authorizing agricultural lands to be taken in exchange for lands situated within a forest reservation that had been surrendered to the government,—no one can doubt that the officers of the local land office would have refused to file or receive the selection of such land under the forest reserve lieu land act. It is said for the complainants that the nonmineral affidavit was not required either by the statute or by any rule or regulation of the land department. Even

if that be conceded to be true, the fact remains that the affidavits were made and filed in support of the selections, and constituted a representation, and one of the means by which the selectors sought to secure the lands, and being made and used for the purpose of evading and defeating the laws of congress, as well as of defrauding the claimants under the mining laws, no court of equity should lend them its aid in securing the fruits of the fraud. No such affidavits were before the court in the case of Olive Land & Development Co. v. Olmstead, and it need hardly be said that, if any such showing had been there made, the only decree that the complainant would have got would have been one dismissing its bill at its own cost. In Finn v. Hoyt (D. C.) 52 Fed. 83, a suit was brought by the United States to cancel two patents that had been issued by the government to the defendants in the suit for certain lands alleged by the complainant to be mineral lands, and that were known to be such by the defendants at the time they were purchased as agricultural lands, and concerning whose character the defendants made to the government officers at the time of the purchase false and fraudulent statements. The court found that the preponderance of the evidence showed that the lands were valuable for mineral, and that the defendants knew that fact at the time they represented them to be agricultural, and accordingly annulled the patents, citing a number of cases in support of its decision. Surely, if a court of equity would annul a patent issued under such circumstances, as it undoubtedly would, it should not grant any equitable relief in advance of patent in respect to claims based upon like false and fraudulent representations.

It is also insisted on the part of the complainants that the purpose for which a selection is made under the act in question is unimportant, and that this court so held in the case of Olive Land & Development Co. v. Olmstead; and, further, that there is in law no mining claim until a discovery of mineral within its limits has been made; that, until such discovery, such a pretended claim is a mere nothing, and that this court so held in the Olive Land & Development Co. Case. That case, and the manifest distinctions that exist between it and the cases at bar, will be hereinafter fully referred to; but I pause now to say, in answer to these two suggestions, that as that case was made to appear to the court, both as to the facts and as to the provisions of law upon which it was rested, the complainant sought to enforce its own right without interfering with any right on the part of the defendants to the suit, and it was under such circumstances that this court said, and properly said, that the motive with which the selection was made was unimportant. "Motive," as said by the circuit court of appeals for this circuit in the recent case of Hanchett v. Chiatovich, 41 C. C. A. 648, 652, 101 Fed. 742, 746, "does not count where one merely exercises his own right, without violating any right of another, but when he does violate the right of another the motive of the act enters largely into the problem." So, too, must the statement of this court in the Olive Land & Development Co. Case, to the effect that the location under which the defendants in that case claimed amounted to nothing, be taken

in connection with the facts about which the court was speaking. Such is the universal rule in respect to the opinions and decisions of courts. There the fact appeared to be that the defendants went upon the land there in controversy prior to the selection under which the complainant claimed, and, without making any discovery of any mineral, posted a notice of the location of a mining claim, and marked its boundaries upon the ground, and then left, and, so far as appeared, never returned. No possession was held or maintained by them, nor did they ever undertake to return until after the complainant made its selection, when they threatened to interfere with its possession and rights. Nor was the land involved in that case ever at any time ascertained to be mineral in character. It was in speaking of such a pretended location that this court said, and properly said, that it amounted to nothing.

The demurrers to the present bills raise the questions of jurisdiction, and of the sufficiency of the bills themselves. The bills expressly allege that upon the making of the selections under which the complainants claim, and the publishing of the notice required by the local rules and regulations of the land department, the defendants to the bills initiated in the land office contests by written protests against such selections, on the ground that the lands selected were mineral lands, and not, therefore, subject to selection under the act of June 4, 1897, and that those contests are still pending in the land department. Those averments of the bills, in my opinion, state the complainants out of court; for no court can lawfully anticipate what the decision of the land department may be in respect to the contests, nor direct in advance what its decision should be, even in matters of law, much less in respect to matters of fact, such as is that relating to the character of any particular piece of land. It was so decided by this court in the case of Savage v. Worsham in an opinion filed April 4, 1892 (104 Fed. 18), and has been likewise decided by other courts. Gaines v. Thompson, 7 Wall. 347, 19 L. Ed. 62, and cases there cited; Sioux City & St. P. R. Co. v. U. S. (C. C.) 34 Fed. 835.

It is urged on the part of the complainants that the protests filed in the land office were insufficient to warrant or justify a hearing in respect to the character of the lands in controversy, in that they failed to show the particulars in respect to their character. It is a sufficient answer to this to say that that is a matter for the decision of the land department itself. Formal pleadings, such as are required in the courts, are not demanded in the land office. But, if the protests should be there held to be insufficient in form, the power to allow them to be amended doubtless exists; for they do allege in express terms that the lands were mineral in character, and therefore not subject to selection under the forest reserve lieu land act, which is the ultimate and controlling fact to be ascertained.

It is further insisted on the part of the complainants that, notwithstanding the averments of the bills in regard to the contests, the other allegations of fact therein constitute a selection of the lands in controversy by the predecessors in interest of the complainants,

and that a perfect equity in the lands was thereby acquired, if the lands were then vacant and contained no known mine or known saline; and it is said that this court so held in the case of Olive Land & Development Co. v. Olmstead, 103 Fed. 568. Let us see. In that case there were not only no affidavits of any kind presented to the court, as has been already stated, but neither in the oral argument nor in the briefs there presented were any rules or regulations prescribed by the land department for the carrying out of the provisions of the forest reserve lieu land act brought to the notice of the court, nor was the act of congress of March 3, 1891 (26 Stat. 1095), repealing the provisions of the pre-emption law, in which, in express terms, and by adoption in the homestead law, was the provision in respect to "known salines or mines," nor did it there appear that the land there in controversy was in the actual possession of any one at the time of the selection under which the complainant in that case claimed, nor that any mineral of any character had ever been discovered thereon, nor that any contest was ever pending or initiated in the land office in respect to the selection under which the complainant there claimed, but, on the contrary, that the selection was accepted by the register and receiver of the local land office, the records of which showed the land to be vacant and open to settlement, and that, as a matter of fact, the land was vacant and unoccupied; the defendants to the suit having only gone upon the land and marked out the boundaries of the mining claim, and posted a notice thereon claiming it as such, without making any discovery of any mineral, and then leaving and never returning. It was upon such facts and the statutory provisions there presented that this court held, and I think properly held, in the Olive Land & Development Co. Case, that the complainant there acquired an equity in which it was entitled to be protected, and the court accordingly awarded the complainant a decree, with a provision therein to the effect that, should the land department of the government at any time prior to the issuance of a patent for the selected tract, determine that the land was not vacant and open to settlement at the time of its selection, the operation of the decree should thereupon cease. In speaking of the act of June 4, 1897, in respect to the exchange of lands, the court said:

"The statute in question is a plain standing offer on the part of the government to exchange any of its land that is vacant and open to settlement for a like quantity of similar land within a forest reservation, for which it had previously issued a patent, or to which an unperfected bona fide claim had been acquired, provided that, in cases of unperfected claims, the requirements of the laws respecting settlement, residence, improvements, and so forth are complied with on the new claims, credit being allowed for the time spent on the relinquished claims; the owner of or settler on the tract within the reservation, in the event of his acceptance of the offer, being required to relinquish his tract to the government, in consideration of which he is given the right to select in lieu thereof a tract of vacant land open to settlement, not exceeding in area the tract covered by his patent or claim, as the case may be, with the further provision that no charge shall be made for making the entry of record or issuing the patent to cover the tract selected. From these provisions [the court continued] it is clear that in such cases of exchange title is to be given by the government for title received, and in cases of unperfected claims the claimant is to occupy a pre-

cisely similar status in respect to the tract selected that he did regarding that relinquished. In all cases the land authorized to be selected in lieu of that relinquished is required to be vacant and open to settlement. When? Manifestly at the date of selection. It is upon its then character and condition that the selector has the right and is bound to act. Before making his selection he must inform himself of the character and condition of the tract desired, but it would be wholly unreasonable to say that he is required to make a selection based upon what may be disclosed in that regard in the future. The right to select is by the statute given to the party invited by the government to make the exchange, without other condition than that the land selected shall be vacant and open to settlement. Neither the act of the selector, however, in making the selection, nor that of the officers of the local land office, upon whose books the selected tract appears to be vacant and open to settlement, in accepting and filing the selection, is conclusive of the then character and condition of the land. Presumptively the character and condition of the selected tract is such as is indicated by the books of the land office, and therefore the selection, with the approval of the officers of the local land office, of a tract appearing upon the books as vacant and open to settlement, in lieu of a similar tract of like dimensions relinquished to the government, gives an equity in the selector which entitles him to protection until the fact in respect to the character and condition of the selected land is, upon proper notice to the equity claimant, otherwise determined by the land department. The right to make that inquiry extends to the time of the issuance of the patent contemplated and provided for by the statute. Hawley v. Diller (decided May 28, 1900) 178 U. S. 476, 20 Sup. Ct. 986, Adv. S. U. S. 986, 44 L. Ed. 1157; Lumber Co. v. Rust, 168 U. S. 589, 593, 18 Sup. Ct. 208, 42 L. Ed. 591; Knight v. Association, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974. But this inquiry, as has been said, is limited to the character and condition of the land at the time of its selection. One reason for this has already been stated, namely, that, while the selector under the act in question may and must inform himself in regard to the then character and condition of the land he desires to take in exchange for that relinquished, it would be altogether unreasonable to hold that he is required to make a selection based upon what may be disclosed in that regard in the future. And, turning to the act under consideration, it is seen, as has already been observed, that the power to 'select' is by the statute given to the party who is invited to make the exchange, provided, always, that he confines his selection to the class of lands described in the statute, to wit, those vacant and open to settlement. No other condition is imposed by the statute. The act in question differs very materially in this respect from the indemnity clauses of many of the railroad and other grants requiring the selections to be made by and with the advice, consent, direction, or approval of some officer of the land department, in which case such consent or approval is deemed a condition precedent to the vesting of any interest in the selected land."

After referring to the case of Culver v. Uthe, 133 U. S. 655, 10 Sup. Ct. 415, 33 L. Ed. 776, this court proceeded to say in Olive Land & Development Co. v. Olmstead:

"It is true that in the case just cited (Culver v. Uthe) a certificate had been issued by the register and receiver of the local land office in lieu of the land warrant surrendered, while here nothing more was done by the register and receiver of the local land office than to receive the deed for the relinquished land, together with the certificate of title thereto, and to accept and file the selection of the tract selected in lieu thereof. But in the present case nothing more was required to be done. The statute makes no provision for the issuance of any certificate by the register and receiver to the selector, or for the issuance to him of any other instrument than a patent. It is well settled that in purchases of land from the government, where one has paid the full purchase price and done all that he is called upon to do by the terms of the statute, he has acquired an equitable title to the property bought."

And further on:

"As has been said, the question that remains open to inquiry by the land department, up to the issuance of patent, is whether or not the selected land was vacant and open to settlement at the time of its selection. Vacant public land is open to settlement under the laws relating to that subject when they contain no 'known salines or mines' (Act Sept. 4, 1841 [5 Stat. 455]; Rev. St. § 2258), whether of gold, silver, petroleum, or any other mineral. The law as to what constitutes a 'known mine,' under the statutes relating to the settlement of public lands, is also thoroughly well established. [Citing various cases.]"

In the main what was there said is correct, even as applied to the facts, statutory provisions, and rules and regulations of the land department presented in the present cases, and as applied to the facts about which the court was speaking, and upon the statutory provisions upon which that case was rested, is entirely correct. The right of selection given by the act of June 4, 1897, is conferred upon the party desiring to avail himself of the exchange proposed by the United States, subject only to the condition that the land selected shall be vacant and open to settlement. But he makes his selection with full knowledge of that condition. The statute of June 4, 1897, does not undertake to prescribe how the condition shall be ascertained and determined, but by the provisions of section 441 of the Revised Statutes the secretary of the interior "is charged with the supervision of public business relating to the following subjects: * * * Second. The public lands, including mines; * * *" and by section 453 of the same statutes it is declared that "the commissioner of the general land office shall perform, under the direction of the secretary of the interior, all executive duties appertaining to the surveying and sale of the public lands of the United States or in any wise respecting such public lands and also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the government"; and by the provisions of section 2478 of the Revised Statutes the commissioner of the general land office is authorized, under the direction of the secretary of the interior, "to enforce and carry into execution by appropriate regulations every part of the provisions of" the title on public lands, not otherwise specially provided for. Of course, such rules and regulations must be reasonable. As has been stated, it did not appear in the case of Olive Land & Development Co. v. Olmstead that any rules or regulations had ever been made pursuant to the provisions of the act of June 4, 1897, but that case was rested in that respect upon the admitted averment of the bill that the selection under which the complainant there claimed was filed and accepted by the register and receiver of the local land office. In the absence of all rules and regulations upon the subject, the court treated, and I think properly treated, such acceptance as an approval of the selection, which satisfied the condition prescribed by the statute, and completed the selection and exchange, leaving only in the officers of the general land office, until the issuance of patent, the right of inquiry into the facts and conditions of the exchange antedating its consummation. The selection, as has been seen, consists of two things —First, the act of selection upon the part of the selector; and, sec-

ond, the approval of his selection by the land department. Both acts are essential to constitute the selection authorized by the statute, but it cannot be that congress intended that the exchange once made should be rendered nugatory by any future discovery of mineral. Shaw v. Kellogg, 170 U. S. 312, 332, 18 Sup. Ct. 632, 42 L. Ed. 1050, and cases there cited; In re McDonald, 30 Land Dec. Dep. Int. 124; Clarke v. Railway Co., Id. 145. The character of the land, and whether it is vacant or occupied, are questions of fact for the determination, and the exclusive determination, of the land department. Steel v. Refining Co., 106 U. S. 447, 450, 1 Sup. Ct. 389, 27 L. Ed. 226; Smelting Co. v. Kemp, 104 U. S. 636, 640, 26 L. Ed. 875.

In Cornelius v. Kessel, 128 U. S. 456, 461, 9 Sup. Ct. 122, 124, 32 L. Ed. 482, 483, the court said:

"The power of supervision possessed by the commissioner of the general land office over the acts of the register and receiver of the local land offices in the disposition of the public lands undoubtedly authorizes him to correct and annul entries of land allowed by them, where the lands are not subject to entry, or the parties do not possess the qualifications required, or have previously entered all that the law permits. The exercise of this power is necessary to the due administration of the land department. * * * But the power of supervision and correction is not an unlimited or an arbitrary power. It can be exercised only when the entry was made upon false testimony or without authority of law. It cannot be exercised so as to deprive any person of land lawfully entered and paid for. By such entry and payment the purchaser secures a vested interest in the property, and a right to a patent therefor, and can no more be deprived of it by order of the commissioner than he can be deprived by such order of any other lawfully acquired property. Any attempted deprivation in that way of such interest will be corrected whenever the matter is presented so that the judiciary can act upon it."

Fraud in the entry or selection, or any mistake of law or lack of authority on the part of the officers of the land department to make the entry, sale, or exchange, as the case may be, of the public lands, may be inquired into and determined by that department at any time prior to the issuance of patent (Orchard v. Alexander, 157 U. S. 372, 383, 15 Sup. Ct. 635, 39 L. Ed. 737; Lumber Co. v. Rust, 168 U. S. 589, 593, 18 Sup. Ct. 208, 42 L. Ed. 591; Diller v. Hawley, 26 C. C. A. 514, 81 Fed. 651; Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, Adv. S. U. S. 986, 44 L. Ed. 1157); after which the matter becomes subject to inquiry only in the courts (U. S. v. Stone, 2 Wall. 525, 535, 17 L. Ed. 765; Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848; U. S. v. Schurz, 102 U. S. 378, 396, 26 L. Ed. 167; Bicknell v. Comstock, 113 U. S. 149, 151, 5 Sup. Ct. 399, 28 L. Ed. 962; Mining Co. v. Campbell, 135 U. S. 286, 10 Sup. Ct. 765, 34 L. Ed. 155; Williams v. U. S., 138 U. S. 514, 11 Sup. Ct. 457, 34 L. Ed. 1026). But matters of fact, such as the character of the land, its condition as to occupancy, and the like, when once investigated and determined by the officers of the land department, and the applicant allowed to select or enter and pay for it, vests a right which cannot be affected by subsequent discoveries in respect to its character or condition. Authorities supra; Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 328, 8 Sup. Ct. 131, 31 L. Ed. 182; Spratt v. Edwards, 15 Land Dec. Dep. Int. 290, 291; Davis' Adm'r v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628, 35 L. Ed.

238; Jones v. Driver, 15 Land Dec. Dep. Int. 514, 518; and numerous cases cited in Olive Land & Development Co. v. Olmstead.

It is shown in the present cases that, as a matter of fact, rules and regulations were prescribed on June 30, 1897, by the commissioner of the general land office, with the approval of the secretary of the interior, for carrying out the provisions of the act of congress of June 4, 1897, both for the exchange of lands within a forest reservation covered by an unperfected bona fide claim and of such tracts as are covered by patent. Subdivision 15 of such rules relates to the former, and by subdivision 16 thereof it is prescribed that, "where final certificate or patent has issued, it will be necessary for the entryman or owner thereunder to execute a quitclaim deed to the United States, have the same recorded on the county records, and furnish an abstract of title, duly authenticated, showing chain of title from the government back again to the United States. The abstract of title should accompany the application for change of entry, which must be filed as required by paragraph 15, without the affidavit therein called for"; which affidavit is required to show the period and length of claimant's residence on his relinquished claim as credit for the time spent thereon to be allowed under the new entry in completing the period of residence required by law. Subdivision 18 of the rules and regulations declares: "All applications for change of entry or settlement must be forwarded by the local officers to the commissioner of the general land office for consideration, together with report as to the status of the tract applied for." The rules and regulations also require notice of the selection to be published for 60 days, within which time objections thereto are authorized to be filed in the local land office. This fact not only appears from the averments of the present bills, but it also appears therefrom, as has been shown, that contests were filed in the local land office within the 60 days against the selections under which the complainants claim, and are still pending in the general land office. And although the court has not been referred to any rule or regulation adopted by the land department prior to the selections under which the complainants claim, requiring them to be accompanied by a nonmineral affidavit, it would seem from the letter of instructions from the secretary of the interior to the commissioner of the general land office, of date March 6, 1900 (29 Land Dec. Dep. Int. 580), in answer to certain questions propounded to him, that there is a rule in existence requiring such nonmineral affidavit to accompany selections under the act of June 4, 1897. The rules and regulations mentioned are in no respect inconsistent with the provisions of the statute, are reasonable, and are therefore valid, and have the same force and effect as statutory provisions. From them it is clear that the officers of the local land office are not empowered to approve any selection under the act of June 4, 1897, but are expressly required to refer the questions in respect to the condition and character of the land sought to be selected to the general land office for consideration, and that there the power rests to determine the second of the two essential things necessary to constitute a selection under the act of June 4, 1897, viz. whether the land sought is vacant and open to settlement. It is,

to say the least, doubtful if persons authorized to select vacant land only are authorized to select lands in the actual bona fide occupancy of others under the settlement laws or under a mining location, even though, in the case of the latter, the location be invalid by reason of the absence of a valid discovery of mineral (Shaw v. Kellogg, 170 U. S. 312, 332, 18 Sup. Ct. 632, 42 L. Ed. 1050); but they are certainly not authorized to effect such selection by any sort of fraud or circumlocution.

In Nevada Sierra Oil Co. v. Home Oil Co. (C. C.) 98 Fed. 673, 680, this court said:

"It is true that, upon mineral land of the United States upon which there is no valid existing location, any competent locator may enter, even if it is in the actual possession of another, provided he can do so peaceably and in good faith, in order to initiate a location for himself; but no right upon any government land, whether mineral or agricultural, which is in the actual possession of another, can be initiated by a forcible, fraudulent, surreptitious, or, clandestine entry thereon. Such entry must be open and aboveboard, and made in good faith. Belk v. Meagher, 104 U. S. 279, 26 L. Ed. 735; Atherton v. Fowler, 96 U. S. 513, 24 L. Ed. 732. One who is in the actual possession of a mining claim, working it for the mineral it contains, and claiming it under the laws of the United States, whether the location under which he so claims is valid or invalid, cannot be forcibly, surreptitiously, clandestinely, or otherwise fraudulently intruded upon or ousted while he is asleep in his cabin or temporarily absent from the claim; for he is there by the permission and invitation of the owner of the land, the United States."

The same reason which precludes the actual possession of another being surreptitiously or clandestinely entered upon prevents it being disturbed by false or fraudulent representations made in the land office. Nor, in my opinion, in view of the act of March 3, 1891, eliminating the words "known salines or mines" from the preemption and homestead laws, is it true, as contended on the part of the complainants, that the lands in controversy are necessarily open to settlement, and therefore to selection, under the act of June 4, 1897, unless they contain "known salines or mines." That was true, as was abundantly shown by the authorities cited in Olive Land & Development Co. v. Olmstead, while the pre-emption and homestead laws excluded from pre-emption and homestead entry only "lands on which are situated any known salines or mines"; but what was not then brought to the attention of the court, and what was apparently not then within the knowledge of counsel in that case, is now made to appear, namely, that congress, on March 3, 1891, by an act entitled "An act to repeal the timber-culture laws, and for other purposes" (26 Stat. 1095), repealed the pre-emption law, and thereby also eliminated from the homestead law the words "known salines or mines," which were in the latter by adoption (Rev. St. § 2289). But congress left in force the provisions of section 2302 of the Revised Statutes, by which it is declared, among other things, that no mineral lands shall be liable to entry and settlement under the provisions of the homestead law. The words "mineral lands" are certainly more general and much broader than the words "lands on which are situated any known salines or mines," formerly existing in the pre-emption and homestead laws. 5 Stat. 453, 455; Rev. St. §§ 2258, 2289, 2317. The wide distinction between them is clearly

pointed out by the supreme court in the cases of Barden v. Railroad Co., 154 U. S. 288, 14 Sup. Ct. 1030, 38 L. Ed. 992; Davis' Adm'r v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628, 35 L. Ed. 238; Deffeback v. Hawke, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423; and numerous other cases that might readily be cited.     Undoubtedly they should be read in connection with the general reservation of mineral lands contained in section 2318 of the Revised Statutes, which declares that "in all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law," and in connection with the provisions of the law in respect to the exploration, occupancy, and sale of the mineral lands of the United States.     The first act upon that subject was that of July 26, 1866 (14 Stat. 251), the first section of which declared that the mineral lands of the public domain were free and open to exploration and occupation by all citizens of the United States and persons who had declared their intention to become citizens, subject to such regulations as might be prescribed by law, and to the local customs or rules of miners in mining districts, so far as they are not in conflict with the laws of the United States.     That act then provided for acquiring by patent the title to "veins or lodes in quartz or other rock in place bearing gold, silver, cinnabar, or copper."     On the 9th of July, 1870, this act was amended so as to make placer claims, including all forms of deposit, "excepting veins of quartz or other rock in place," subject to entry and patent, under like circumstances and conditions and upon similar proceedings as those provided for vein or lode claims.     16 Stat. 217.     The act of May 10, 1872, to promote the development of the mining resources of the United States, repealed several sections of the act of 1866, and, among others, the first section; but enacted in place of it a provision declaring that "all valuable mineral deposits" in lands belonging to the United States, both surveyed and unsurveyed, were "free and open to exploration and purchase, and the lands in which they are found to occupation and purchase," subject to the conditions named in the original act.     17 Stat. 91.     Other sections pointed out with particularity the procedure necessary to obtain the title to veins, lodes, and placer claims, and defined the extent of each claim to which title might be thus acquired.     By the act of February 18, 1873, mineral lands in the states of Michigan, Wisconsin, and Minnesota were excepted from the act of May 10, 1872, and those lands were declared to be free and open to exploration and purchase, according to legal subdivisions, in like manner as before.     17 Stat. 465.     The provisions of the act of 1872, with the exceptions made by the act of 1873, were carried into the Revised Statutes.     The only settlement laws in force at the time of the selections under which the complainants claim, or now in force, are the homestead and town site laws. The town site laws (Rev. St. § 2380 et seq.) authorize the president to reserve from the public lands town sites on the shores of harbors, at the junctions of rivers, important portages, or at any natural or prospective center of population; declare when the survey of such reservations into lots may be made and the sale of the land had; prescribe with particularity the manner in which parties who have

founded, or may desire to found, a city or town on the public lands may proceed, and the title to lots in them be acquired. They also provide for the entry at the proper land office for portions of the public lands occupied as town sites, such entry to be made, by its corporate authorities, or, if the town be unincorporated, by the judge of the county court of the county in which the town is situated, the entry to be in trust for the use and benefit of the occupants according to their respective interests. They contain many other clauses respecting such sites, which need not be enumerated, as enough has been stated to show that the lands here in controversy were never at any time open to settlement under those laws, for the reason that it is not pretended that the lands in controversy are or ever were within any town site, and therefore were never subject to settlement under those laws. The town site laws, therefore, have no application to the present cases, and the only settlement law that has is the homestead law, the pre-emption law having been repealed in 1891. And the homestead law, as has been seen, has not since March 3, 1891, contained the clause in regard to "known salines or mines," but declares "that no mineral lands shall be liable to entry and settlement" under its provisions. Rev. St. § 2289. Whether the lands in controversy, or any other particular tract or tracts of land, should be classed as mineral or agricultural, is a question for the determination of the land department. It appears that the lands in controversy were surveyed by the government about the year 1854, and that the surveyor returned them as agricultural lands, and that they were so entered upon the books of the land office. Prima facie, therefore, they are such, but prima facie only. "Information of the character of all lands surveyed," said the court in Barden v. Railroad Co., supra, "is required of surveying officers, so far as knowledge respecting them is obtained in the course of their duties, but they are not clothed with authority to especially examine as to these matters outside of their other duties, or determine them, nor does their report have any binding force. It is simply an addition made to the general information obtained from different sources on the subject. In Cole v. Markley, 2 Land Dec. Dep. Int. 847–849, Mr. Teller, when secretary of the interior, in a communication to the commissioner of the general land office, speaks at large of the notations of surveyors, and says: 'Public and official information was the object of these notations, with a view to preventing entry until the facts are finally determined. They should be, and they are, only prima facie evidence, and subject to be rebutted by satisfactory proof of the real character of the land.' The determination of the character of the land granted by congress, in any case, whether agricultural or mineral or swamp or timber land, is placed in the officers of the land department, whose action is subject to the revision of the commissioner of the general land office, and on appeal from him by the secretary of the interior. Under their direction and supervision, the actual character of the land may be determined and fully established." And the court added: "There are undoubtedly many cases arising before the land department in the disposition of the public lands where it will be a matter of much difficulty

on the part of its officers to ascertain with accuracy whether the lands to be disposed of are to be deemed mineral lands or agricultural lands, and in such cases the rule adopted that they will be considered mineral or agricultural, as they are more valuable in the one class or the other, may be sound. The officers will be governed by the knowledge of the lands obtained at the time as to their real character. The determination of the fact by those officers that they are one or the other will be considered as conclusive."

In one of the briefs of counsel for the complainants it is said that since the repeal of the pre-emption law, and the elimination from the homestead act of the words "known salines or mines" in 1891, the land department has continued to hold that land is subject to settlement under the homestead laws, unless it contains known mines or salines; citing, in support of the statement, Jones v. Driver, 15 Land Dec. Dep. Int. 518; Arthur v. Earle, 21 Land Dec. Dep. Int. 92, 93; Reid v. Lavallee, 26 Land Dec. Dep. Int. 100. Neither of these cases at all sustains the point to which they are cited. In Jones v. Driver the land in dispute was sought to be entered as a homestead on November 13, 1888, against which a protest was filed May 31, 1890. The secretary held that, up to the time of the making of final proof, the making of payment, and the issuance of the final certificate as the basis of a patent, it was permissible to show the true character of the land. While this case does not, as has been said, at all support the point to which it is cited by counsel, it is in accord with what has been hereinbefore decided, to the effect that, after the sale or exchange of land has been consummated, no subsequent discovery can affect it. The case of Arthur v. Earle, 21 Land Dec. Dep. Int. 92, is to the same effect, and cites in support of the ruling there made Jones v. Driver, and also Rea v. Stephenson, 15 Land Dec. Dep. Int. 37. The case of Reid v. Lavallee, 26 Land Dec. Dep. Int. 100, involved a question of estoppel, not pertinent here, and also the question as to whether or not the land there in controversy was more valuable for mineral or for agricultural purposes, and those were the only questions in the case. Upon the latter the secretary said:

"It does not appear from the evidence that any mineral of appreciable value has been found upon the land in controversy. The work upon the lode claim prior to the cash entry consists chiefly of a tunnel of about 100 feet in length, which commences about 350 feet west of the west line of the homestead. Within 10 or 15 feet of the mouth of this tunnel some small bodies of rock carrying gold appear to have been found, and a little further on a stringer of quartz bearing small quantities of gold, but these all seem to have soon pinched out, and the amount of precious mineral obtained from the tunnel in the aggregate was of such small value as to afford no adequate compensation for the expenditure incurred. No well-defined ledge or lode carrying valuable mineral is shown to have been discovered, nor is the land shown to contain mineral in any state of such value as to justify expenditure to obtain it, nor does the showing warrant the belief that further expenditure would disclose the presence therein of valuable ore or valuable mineral of any sort. It is also shown, on the other hand, that the land in controversy, or the greater part thereof, has a rich, deep, black soil, is well adapted to the growing of fruits and vegetables, and can be easily irrigated, and that Lavallee raised thereon vegetables of good quality."

In conclusion, I think it proper to say that from the nature of the affidavits filed in these cases it is manifest that some of the affiants

104 F.—4

have committed willful and deliberate perjury. The attention of the United States attorney for this district is therefore directed to the matter, that he may bring the affidavits to the attention of the grand jury now impaneled for this district, that they may look carefully into them, and take such course as may be found to be proper.

In each of the cases an order will be entered denying the applications for a receiver and for an injunction, sustaining the demurrers, and dismissing the bill at the complainants' cost.