### UNITED STATES v. McCUTCHEN et al.

#### (District Court, S. D. California, N. D. September 1, 1914.)

#### No. A–12.

1. MINES AND MINERALS (§ 36*)—OIL LOCATIONS—VALIDITY.
   Where subsequent locations are made in the interest of and to protect and strengthen a prior location, neither of such subsequent locations will be held fraudulent, though made in whole or in part by persons who had no intentions of claiming the land or any interest in it for themselves.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87; Dec. Dig. § 36.*]

2. MINES AND MINERALS (§ 36*)—LOCATION—GRANTEES.
   Where several persons interested in a location of oil land conveyed their rights to one of their number for convenience in handling the land for their benefit, he was bound to exercise the highest good faith toward the others interested in the location, and having neglected to do the assessment work for one year, and being of the opinion that the original locators could not relocate after such failure, he was not guilty of fraud in procuring a relocation by other relatives for the benefit of the original parties.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87; Dec. Dig. § 36.*]

3. MINES AND MINERALS (§ 36*)—OIL LOCATION—QUANTITY OF LAND.
   An oil location of 160 acres, if made in good faith by eight locators for the benefit of eight other persons eligible to locate, is not fraudulent.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87; Dec. Dig. § 36.*]

4. MINES AND MINERALS (§ 36*) — OIL LOCATION — WITHDRAWAL OF LAND FROM ENTRY.
   Where a grantee of an oil location was actually on the land, had expended a large sum of money, and had discovered oil before the passage of Act Cong. June 25, 1910, c. 421, 36 Stat. 847 (U. S. Comp. St. 1913, §§ 4523, 4524), authorizing the withdrawal of oil land from entry, a withdrawal order, entered September 27, 1909, was ineffective to terminate such corporation's right to land.

   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 87; Dec. Dig. 36.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. MINES AND MINERALS (§ 38*)—OIL LAND—LOCATION—WITHDRAWAL FROM ENTRY—RECEIVERS.**

In a suit by the United States to quiet title to oil land alleged to have been fraudulently entered, facts *held* insufficient to justify the appointment of a receiver pendente lite.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 87½–113; Dec. Dig. § 38.*]

In Equity. Suit by the United States of America against G. W. McCutchen and others to quiet title to certain oil land. On application for the appointment of a receiver. Denied.

E. J. Justice, Sp. Asst. Atty. Gen., of Greensboro, N. C., and A. I. McCormick, Sp. Asst. Atty. Gen., of Los Angeles, Cal., for the United States.

Harding & Monroe, Lindley & Eickhoff, and W. E. Colby, all of San Francisco, Cal., for defendant Pacific Midway Oil Co.

Lewis W. Andrews and T. O. Toland, both of Los Angeles, Cal., for defendant Maricopa Star Oil Co.

Curtis H. Lindley, of San Francisco, Cal., for defendant Obispo Oil Co.

Samuel M. Shortridge, of San Francisco, Cal., for defendants Spreckles Oil Co. and J. D. Spreckles, Jr.

J. W. Wiley, of Bakersfield, Cal., for defendants McCutchen and McCutchen Bros.

A. L. Weil, of San Francisco, for defendant General Petroleum Co

DOOLING, District Judge. This is a bill in equity, brought by plaintiff for the purpose of quieting its title to the S. W. ¼ of section 32, township 12 N., range 23 W. S. B. M., situated in Kern county The land is oil-producing land, and is averred in the bill to be of a value exceeding $10,000,000. The present motion is for the appointment of a receiver. Upon the hearing of the motion something over 40 affidavits were submitted, together with nearly 700 pages of typewritten testimony, which was taken in support of and in opposition to the application for a patent to this land, made on behalf of the defendant Pacific Midway Oil Company. An extended review of all of this testimony is impossible within the limits of this decision. I must content myself with a brief statement of some of the salient facts, though the omission herefrom of any fact appearing in the evidence does not mean that such fact was not considered.

In January, 1900, G. W. McCutchen, R. L McCutchen, Lena McCutchen (his wife), W. C. McCutchen, J. B. McCutchen, M. P. McCutchen (his wife), C. W. Johnson, and M. A. Johnson (his wife), known in the record as the McCutchen family, filed a mineral location notice upon this land, and recorded the same in the office of the recorder of Kern county. G. W. McCutchen, R. L. McCutchen, J. B. McCutchen, and W. C. McCutchen are brothers, known in the record as the McCutchen Bros., and M. A. Johnson is their sister. The location thus filed is known as the Lone Star location. Before the making of this location G. W. McCutchen, R. L. McCutchen, and C. W. Johnson, their brother-in-law, went upon the ground, surveyed

it, staked the corners, and put a mound around each stake. In December, 1900, the other locators by quitclaim deed conveyed their interest to R. L. McCutchen for the better convenience in handling it for them. He was to do the annual assessment work, presumed to be necessary in order to prevent others from locating the land. This work he did yearly until the year 1906. Failing to do the work in that year, he procured some of his wife's relatives, known as the Freears, to locate the land on January 1, 1907. This location was known as the Cormorant, and while actually posted on the land contained a misdescription of it, both as to township and range, and an amended location by the same persons was made on December 15, 1908. This location was also posted on the land; but it, like its predecessor, contained a misdescription, this time as to the range only.

By deed dated December 5, 1908, the locators of the Cormorant quitclaimed to the McCutchen Bros.; but before that, in November of that year, the latter had already begun the erection of a standard drilling rig upon the land, which rig they afterwards completed at an expense of about $2,000. Though this deed is dated December 5, 1908, the last acknowledgment thereon is dated February 2, 1909, on which day also it was recorded. In January, 1909, and before receiving this deed, the McCutchen Bros., through G. W. McCutchen, entered into negotiations with one C. W. Smith, looking to the making of an agreement by which Smith was to develop the land, and, if oil were discovered, he was to apply for a patent therefor, upon the receipt of which he should convey the north half thereof to the McCutchen Bros. and retain the south half for himself. In the development work he was to have the use of the rig which the McCutchen Bros. had placed on the land. These negotiations resulted in the making of an agreement on February 26, 1909, with the Obispo Oil Company, which had been organized through the efforts of Smith and others for the purpose of developing this land upon the conditions stated above. These negotiations also had another result. One of the McCutchen Bros. was absent, and it was not possible to secure his signature to any agreement. The Cormorant locators had conveyed to the four McCutchen Bros., and while their deed correctly described the land their location notices did not. The absence of one of the parties, and a misdescription of the land prevented any immediate action under the Cormorant location.

G. W. McCutchen, who was negotiating with Smith, then procured another location to be made upon this land, which is known as the Hawk location. This location contained the names of himself and his sister, M. A. Johnson, two of the original Lone Star locators, together with the names of six others, who permitted G. W. McCutchen to use their names for the purpose of locating the land, but who never claimed any interest therein. The location was made February 12, 1909, and on February 13th a quitclaim deed from all the other locators to G. W. McCutchen was executed and recorded. The agreement with the Obispo Oil Company of February 26th, mentioned above, was made by G. W. McCutchen, who then held whatever title was secured by the Hawk locators, and who on the same day by quit-

claim deed conveyed the land to the Obispo Oil Company, for the purposes in the agreement mentioned. Neither the deed nor the agreement referred to any of the locations that had been made upon the land, but simply described the land itself by government subdivision. Under this deed and agreement the Obispo Oil Company in March, 1909, began operations upon the land, and continued without interruption until August 5th of that year, by which time it had expended something between $16,000 and $18,000 in a vain attempt to discover oil. For lack of funds active operations were suspended upon August 5th, and the land, rig, and machinery were left in charge of representatives of the Obispo Oil Company, while the latter was endeavoring to secure more money, or make some other arrangement for the further development of the land. On September 27, 1909, the land was withdrawn by the withdrawal order of that date known as "temporary withdrawal order No. 5."

The Obispo people were not able to make any arrangements until January 19, 1910, on which date the company entered into an agreement with one F. W. Nightingill (subject to the Obispo Company's contract with G. W. McCutchen) by which Nightingill agreed to pay the company $6,000 and take upon himself the fulfillment of the Obispo contract with McCutchen, and upon the discovery of oil, and the securing of a patent by him, he was to convey to McCutchen the north half of the land, and to the Obispo Company the southeast quarter thereof, retaining the southwest quarter for himself. Pursuant to this agreement the Obispo Oil Company on January 26, 1910, by quitclaim deed, conveyed the land to said F. W. Nighingill, and on February 7, 1910, the latter by similar deed conveyed it to defendant Pacific Midway Oil Company. This company, using the rig and machinery placed on the land by the McCutchen Bros. in December, 1908, and beginning operations in February, 1910, prosecuted the work of development uninterruptedly until June 6, 1910, at which time oil was discovered in paying quantity upon the southwest quarter of the land. Up to the time of the discovery of oil the defendant Pacific Midway Company had expended about $24,000. After discovery, and on June 27, 1910, another location, known as the Mudhen location, was made of the land in the name of five of the original locators of the Lone Star and three other McCutchens. Those of the original Lone Star locators whose names were not used in the Mudhen location, were Geo. McCutchen, C. W. Johnson, and Mrs. M. A. Johnson. The other locators of the Mudhen all conveyed to G. W. McCutchen by deed dated July 12, 1910. On July 2, 1910, the land was again withdrawn under the act of June 25, 1910.

In the winter of 1910, the Obispo Oil Company began operations upon the southeast quarter of the land, to which it was entitled to a reconveyance from the Pacific Midway Company under its contract with Nightingill, which the Pacific Midway Company had agreed to carry out. It sank three wells upon this quarter, one of which proved very productive. G. W. McCutchen, it will be remembered, was entitled to a reconveyance from the Pacific Midway Company of the north half of the tract, containing 80 acres. In September, 1910, he

entered into a contract with the defendant Maricopa Queen Oil Company, by which the company was to sink eight wells upon the westerly 20 acres, under lease from him, by the terms of which he was to receive one-fourth of the product of the wells. This company operated up to October, 1913, by which time it had sunk seven of the eight wells required, and had been by agreement with McCutchen relieved of the necessity of sinking the eighth. In October, 1913, it sold its lease to the defendant Maricopa Star Oil Company, which is now in possession and operating upon the 20 acres mentioned. The remaining 60 acres of the north half of the tract were sold by G. W. McCutchen to J. D. Spreckles, Jr., in April, 1911, for the sum of $120,000, $60,000 of which was paid by Spreckles before obtaining possession. Of these 60 acres, 20 acres, being the east half of the northwest quarter of the land in dispute, have passed to the ownership of the defendant Spreckles Oil Company, which has sunk seven wells thereon, and the remaining 40 acres have passed to the ownership of defendant General Petroleum Company, which company paid therefor a sum stated to be $281,482.46. This company has also sunk a number of wells on this 40 acres, and is now in the possession thereof. It will thus be seen that of the 160 acres involved in this action, the defendants, the so-called operators, are in the possession of the following portions, their paper titles thereto being all derived through G. W. McCutchen:

Pacific Midway Company, S. W. ¼.............................being 40 acres
Obispo Company, S. E. ¼................................... " 40 acres
Maricopa Star Company, W. ½ of N. W. ¼........,......... " 20 acres
Spreckles Company, E. ½ of N. W. ¼..................... " 20 acres
General Petroleum Company, N. E. ¼..................... " 40 acres

The Pacific Midway Company being under obligation to secure a patent, by reason of its contract with Nightingill, who in turn had assumed the obligations of the Obispo Company, made application for such patent on April 28, 1912, basing its application upon the Hawk location. Plaintiff has opposed this application in the Land Office, on the ground that said Hawk location was a fraudulent one, and made by seven dummy locators in conjunction with G. W. McCutchen for the purpose of fraudulently endeavoring to secure for said McCutchen 160 acres of land, being 140 acres more than as an individual he could claim under the law. The present bill is based upon the claim that the Hawk location was fraudulent for the reasons above set forth, and that as all of the defendants have entered upon the land, and operated thereon, under this location and none other, the possession of each and the claims of each are tainted with the original fraud. The defendants in answer to this charge deny that there was any fraud in any of the locations, but claim that every location subsequent to the Lone Star location of January, 1900, was made in good faith in aid of that location and for the benefit of the original Lone Star locators.

[1] If this claim be true, and the Hawk location and the Freear or Cormorant locations were made in the interest of and for the purpose of protecting and strengthening the original Lone Star location,

then neither the Cormorant location nor the Hawk location was a fraudulent one, even though made in whole or in part by persons who had no intention of claiming the land or any interest in it for themselves. That the Cormorant location was made at the instance of R. L. McCutchen for the purpose claimed the testimony leaves little room to doubt. The original Lone Star locators had conveyed to him for convenience in handling the land for their benefit; he had neglected to do the assessment work for 1906, which was deemed necessary to prevent the land from being located by others; he was of the opinion that the original locators could not relocate after failure to do assessment work; and he therefore secured a relocation by other relatives. It is of interest to note in this connection that the McCutchen Bros., who were the only ones of the Lone Star locators possessed of any means, had, before securing any deed from the Cormorant locators, begun the erection of a standard rig, which eventually cost at least $2,000.

[2] R. L. McCutchen was bound to act, in so far as this land was concerned, in the highest good faith towards the other members of the McCutchen family, who had been the original Lone Star locators and had intrusted to him their legal title for protection. This is also true of Geo. McCutchen, W. C. McCutchen, and J. B. McCutchen, who with him were the grantees of the Cormorant locators. At the time of the Hawk location it seemed to be necessary to act quickly, one of the brothers was away, and his signature not available. There was a misdescription of the land in the Cormorant locations, and G. W. McCutchen, acting, if not upon the advice of Judge Claflin, a reputable attorney and former superior judge, at least with his knowledge and acquiescence, caused the Hawk location to be made, and took a conveyance to himself, in order to be able to enter at once into a contract with C. W. Smith. Whether upon a trial of this cause it should be found that, as claimed, the Hawk location was for the benefit of and in support of the former locations, and reverted to the Lone Star location, cannot, and need not, now be determined.

[3] Such a location, if made in good faith, by eight locators, for the benefit of eight other persons eligible to locate, would not be fraudulent. The question here is: Should a receiver be appointed under all the circumstances disclosed? It must be borne in mind that all of the operators who are now upon the land have expended their money in purchase and development in good faith, and without any knowledge of the existence of any fraud, if there were such, in the Hawk location, which was regular on its face. They have all expended large sums of money in developing what was undeveloped and unimproved territory. Not one of them has as yet been repaid the amounts so expended. *Their* operations, at least, are not tainted with fraud, and it is not at all certain that their good faith might not protect them even against a finding that the Hawk location was a fraudulent one.

[4] Moreover, the Pacific Midway Company was actually upon the land, had expended a large sum of money, and had discovered oil before the passage of Act June 25, 1910, c. 421, § 1, 36 Stat. 847 (U.

S. Comp. St. 1913, § 4523); and this court has held, in another proceeding, that the withdrawal order of September 27, 1909, was ineffective.

[5] The Pacific Midway based its application for a patent upon the Hawk location, because it appeared to be regular; but, even if it were not, as under the evidence so far presented no fraud can be imputed to this company, and as it was in possession, and had made discovery while the land was still open to exploration, it may well have inaugurated rights of its own. Besides, if the Hawk location were in fact invalid, it could not affect the rights of the McCutchen Bros., who were actually in possession, and engaged in the erection of a rig, at the time that it was made. And up to that time at least there seems to be no reason to doubt the truth of their claim that they were acting for the original Lone Star locators. The whole situation is too clouded to warrant the court at this time in disturbing the possession of the operating companies, whose good faith is beyond question, and who have expended such vast sums of money in developing what was before their advent wholly unproved, and possibly worthless, territory.

The application for the appointment of a receiver will therefore be denied.