UNITED STATES v. McCUTCHEN et al. SAME v. KINSEY et al. SAME v. MIDLAND OILFIELDS CO., Limited, et al.

(District Court, S. D. California, N. D. July 12, 1915.)

Nos. A–12, A–13, A–30.

1. MINES AND MINERALS ☞2—OIL MINING CLAIMS—ORDER WITHDRAWING LANDS FROM ENTRY.

An oil locator on a placer mining claim has in strictness no vested right as against the United States until he has made a discovery of oil; but it has been the policy of the law to recognize his equity so long as he is expending money in a good-faith attempt to make the discovery, and the exception in the presidential order of September 27, 1909, withdrawing certain lands from entries of any kind, of "all locations or claims existing and valid on this date," and permitting them to proceed to entry in the usual manner, extends to and protects a claim previously located, on which work leading to a discovery of oil was then being diligently prosecuted, although no discovery had been made at that time.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2; Dec. Dig. ☞2.]

2. MINES AND MINERALS ☞2—OIL MINING CLAIMS—RIGHTS OF CLAIMANTS—WITHDRAWAL OF LANDS FROM ENTRY.

Neither the exception in such order nor the provision of Act June 25, 1910, c. 421, 36 Stat. 847 (Comp. St. §§ 4523–4525), that the rights of any person who at the date of any such order was a bona fide occupant or claimant, and was at such date "in diligent prosecution of work leading to a discovery of oil," should not be affected by such order so long as he should "continue in diligent prosecution of said work," applies to save any right in a locator who prior to the date of the order had ceased work for want of funds and never resumed, and where the claim was then resided on by a person placed there for the sole purpose of holding possession. Nor did subsequent work by an assignee of such locator in sinking new wells, commenced while the order was in force and prosecuted to a discovery, give any right to such assignee; the land having previously become subject to the full force and effect of the withdrawal order.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2; Dec. Dig. ☞2.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. MINES AND MINERALS ☞9—OIL MINING CLAIMS—EFFECT OF ORDER WITH-DRAWING LANDS FROM ENTRY.**

A claim initiated by a location made while such order was in force can be the basis of no rights as against the United States as the owner of the title, but the claimant is a mere trespasser.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 9–13; Dec. Dig. ☞9.]

**4. MINES AND MINERALS ☞38(7)—SUIT BY UNITED STATES TO RESTRAIN WASTE—RECEIVERSHIP.**

In a suit by the United States to quiet its title to lands, its legal title to which is unquestioned, and to restrain waste by defendants, who are in possession and extracting and selling oil therefrom, which constitutes their only value, complainant *held* entitled to the appointment of a receiver.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 91; Dec. Dig. ☞38(7).]

In Equity. Suits by the United States against George W. McCutchen and others, against David Kinsey, the Midway Field Oil Company, and others, and against the Midland Oilfields Company, Limited, and others. On motions by complainant for injunctions to restrain waste and for appointment of receivers. Motions granted.

E. J. Justice, Sp. Asst. Atty. Gen., and Albert Schoonover, U. S. Atty., of Los Angeles, Cal., for the United States in all cases.

In Case No. A–12:

Beasly & Fry, of San Jose, Cal., for Bean-Spray Pump Co.

Samuel Shortridge, of San Francisco, Cal., for Spreckles Oil Co., and John D. Spreckles.

A. L. Weil, of San Francisco, Cal., for General Petroleum Co.

J. W. Wiley, of Bakersfield, Cal., for McCutchen and others.

A. L. Weil, of San Francisco, Cal., for Davis S. Bachman.

R. T. Harding, of San Francisco, Cal., for Pacific Midway Oil Co. and Monroe.

M. S. Platz, of Bakersfield, Cal., for D. F. & M. F. Francis.

Curtis H. Lindley, of San Francisco, Cal., for Obispo Oil Co.

Geo. W. Lane, of San Francisco, Cal., for Independent Oil Producers' Co.

R. T. Harding, of San Francisco, Cal., for Pacific Midway Oil Co., Pacific States Refiners' Co., and American Oriental Co.

A. V. Andrews and T. O. Toland, both of Los Angeles, Cal., for Union Oil Co., Maricopa Star Oil Co., and Producers' Transp. Co.

A. V. Andrews and T. O. Toland, both of Los Angeles, Cal., for Maricopa Oil Co.

Geo. E. Whitaker and Rowan Irwin, both of Bakersfield, Cal., for Edith F. Coons.

Oscar Lawler, of Los Angeles, Cal., for Midway Field Oil Co.

In Case No. A–30:

A. L. Weil, of San Francisco, Cal., for Midland Oilfield Co.

Andrews, Toland & Andrews, of Los Angeles, Cal., for Union Oil Co.

Geo. Lane, of San Francisco, Cal., for Independent Oil Producers' Co.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Case No. A–13:

Oscar Lawler, of Los Angeles, Cal., for Midway Field Oil Co. and United Midway Oil Lands Co.

Andrews, Toland & Andrews, of Los Angeles, Cal., for Union Oil Co.

J. S. McKnight, of Los Angeles, Cal., for Letteau & Kinney.

Hunsaker & Britt, of Los Angeles, Cal., for A. T. Jergins.

BLEDSOE, District Judge. Application is made in each of the above-entitled cases for the issuance of an injunction in the nature of a restraint of waste, and for the appointment of a receiver to take charge of and operate the oil wells situate upon the properties in controversy. Substantially the same state of facts is presented in each case, and the legal questions presented for determination are essentially similar. All are suits to quiet the title of the government in and to certain oil lands in this state now in the possession of and claimed under oil land locations by the respective defendants. The basis of the government's claim in this behalf is that the lands were withdrawn from entry and location by the government and that in consequence the entry of the respective defendants thereon has served in no wise to give them any rights as against the government.

It will be remembered in this connection that on September 27, 1909, the President of the United States issued his much discussed withdrawal order, temporarily withdrawing from all forms of location, settlement, etc., certain specified public lands, including those in controversy herein, then belonging to the United States government; and, although the validity of this order was challenged at every step by those interested in the oil industry, it successfully withstood every attack, and was finally and definitely upheld in its every aspect by the Supreme Court of the United States in United States v. Midwest Oil Co. (decided February 23, 1915) 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 673. All of the lands involved in these cases were included within the terms of the withdrawal order.

In the Kinsey and Midland Oilfields Company Cases the facts as alleged in the verified bills are comparatively simple. In the Kinsey Case it is alleged: That the plaintiff, the United States government, now is, and at all the times mentioned and ever since the treaty of Guadalupe Hidalgo has been, the owner and entitled to the immediate and exclusive possession and enjoyment of all of the lands described in the bill, and particularly all of the oil, petroleum, gas, and other mineral therein contained. That at all times mentioned all such lands have been and now are part of the public domain, except as withdrawn and reserved from entry as is thereinafter alleged. That said lands now are and at all times have been oil and gas bearing lands, containing rich deposits of petroleum or mineral oil and gas in commercially paying quantities, and at all times said lands have been and now are chiefly valuable for the petroleum or mineral oil deposits therein.

It is then alleged that on the 14th day of September, 1908, the Secretary of the Interior duly and regularly withdrew and reserved the said lands from settlement, entry, or purchase, under the agricultural

land laws of the United States, for the purpose of examining and classi-
fying them. On June 9, 1909, the said lands were duly and regularly
classified by the said Secretary as petroleum or oil-bearing lands. On
September 27, 1909, the President of the United States, under author-
ity legally invested in him so to do, duly and regularly withdrew and
reserved all of said lands by the withdrawal order hereinabove referred
to. On July 2, 1910, the President, under the authority specially in-
vested in him by virtue of the provisions of the act of Congress approv-
ed June 10, 1910 (36 Stat. 847), duly and regularly ratified, and con-
tinued in full force and effect his order of withdrawal of September
27, 1909, aforesaid, and did further withdraw and reserve all of such
lands from mineral exploration, occupation, and from all forms of loca-
tion, settlement, application, selection, etc., under the mineral or non-
mineral public land laws of the United States. That both of said or-
ders of withdrawal and reservation have ever since their respective
dates been, and now are, in full force and effect.

It is next alleged that there was no petroleum or other mineral pro-
duced or discovered on said lands until long after July 10, 1910, but·
it was first produced thereon on or after March 15, 1912, by the Mid-
way Field Oil Company, one of the defendants named, and that there
was no other production by any of the defendants, or any other person,
of petroleum or mineral oil or gas, or other mineral, on said premises,
until long subsequent to March 15, 1912. Several placer mineral lo-
cations upon said land are then specifically referred to, but speaking
of them in gross, it may be said that all of them that were made prior
to September 27, 1909, were abandoned by their respective locators,
and that none of the locators thereof ever made any discovery on said
lands.

It is alleged that on June 8, 1910, the "Blue Feather" mineral location
was made on said land, and that on June 9, 1910, the "Midway mine"
location was made thereon. It is also alleged that subsequent to the
2d day of July, 1910, the United Midway Oil Land Company, claim-
ing under and through the said "Midway mine" location, entered upon
said property, and that thereafter the Midway Field Oil Company, as
its lessee, entered upon said property under and by virtue of said "Mid-
way mine" location, and, after drilling a well upon said claim, made a
discovery of oil thereon, and proceeded to and are now extracting from
said land large quantities of petroleum and mineral oil. It is also al-
leged the Union Oil Company of California, the only other operator
upon said claims, entered thereon subsequent to the 2d day of July,
1910, and made a discovery thereon, and effected a subsequent produc-
tion of oil therefrom.

It is then alleged that no discovery of oil or petroleum upon said
premises has ever been made upon any part of said land, except as is
hereinabove set out; that no valid location or entry of, or claim to,
said land under the public land laws, or otherwise, was ever made or
acquired by defendants, or either of them; and that on the 27th day of
September, 1909, there was no locator or person in occupancy of the
said claim, as claimant or otherwise, and that on the 2d day of July,
1910, there was no person or corporation in diligent prosecution of

work leading to the discovery of oil or gas on said lands under any location or pretended location, or otherwise. It is then alleged in apt language that the defendants have no rights upon said lands; that they are trespassers thereon, and are extracting oil and gas therefrom without right, and to the irreparable injury of the proprietary rights of the plaintiff in and to the said property. It is also alleged that the value of the lands referred to exceeds $1,000,000.

In the Midland Oilfields Company Case, the bill of complaint in which was filed March 30th of this year, with reference to the particular matters in controversy, it is alleged that the President made the withdrawal order of September 27, 1909, hereinabove referred to including the lands in controversy in the suit, and that notwithstanding such order, and in violation of the proprietary rights of plaintiff, and of the lawful orders and proclamations of the President, and particularly in violation of the aforesaid withdrawal order, the defendants named entered upon the premises in controversy long subsequent to the said 27th day of September, 1909, but that, some time after the year 1910, one of the defendants discovered petroleum on said lands, has since produced and caused to be produced large quantities thereof, and threatens to continue the extraction and sale of the same. It is then alleged that none of the defendants or any other person was bona fide occupant or claimant of said land, and in the diligent prosecution of work leading to the discovery of oil or gas, on September 27, 1909. It is alleged that the value of the lands in controversy in this suit exceeds $500,000.

General allegations are made in all the complaints that the defendants in possession and engaged in producing oil from the respective properties involved are actually extracting oil therefrom in large quantities, and converting the same to their own use; that defendants threaten to continue so to operate said properties, and otherwise commit waste and trespass upon the lands of right belonging to plaintiff, to its irreparable injury, and in violation of its settled policies with respect to the conservation of its petroleum deposits. It will be observed that in both of the cases last hereinabove referred to the initiation of the rights of the defendants upon the lands in controversy occurred subsequent to the date of the presidential withdrawal order of September 27, 1909. In this respect these cases differ from the McCutchen Case now to be referred to, in that the rights of defendants involved in that case were initiated prior to the date of the withdrawal order. The McCutchen Case is also different, in that an application for a receiver, based upon the bill of complaint therein, has been made to this court heretofore, Judge Dooling, of the Northern District of California presiding, and an order was made denying such application. It is different also in that one of the defendants named therein made application for a patent to a part of the land involved, which application, after hearing by the Commissioner of the General Land Office and the Secretary of the Interior, was, subsequent to the making of Judge Dooling's order, refused. Land Decision dated April 21, 1915, Advance Sheets, p. 420, vol. 44.

The facts involved in the McCutchen Case are very succinctly stated

by Judge Dooling in his opinion filed at the time of the denial of the motion for a receivership, reported in 217 Fed. 650, and it is unnecessary, therefore, to reiterate them here, or to refer to them save merely for purposes of explaining my ruling herein. It is apparent from Judge Dooling's decision that request was made of him for the appointment of a receiver upon two grounds: First, the alleged fraud on the part of the locators of the lands in question in the making of the location which was sought to be made the basis for the patent; and, secondly, because of the nondiscovery of oil upon the premises previous to the promulgation of the withdrawal order of 1909. Judge Dooling refused to grant the application upon either of the grounds urged, because he had, as he says, prior thereto, and in another proceeding, held that the withdrawal order was ineffective, and also because, considering the strongly controverted questions of fact involved, he felt that there was such a doubt as to the fraud alleged as to justify, if not require, a denial of the application. Since the rendition of his opinion, the Supreme Court, as adverted to hereinabove, has held, however, that the withdrawal order was valid, and this court must now determine, in the added light of the Supreme Court decision, the effect of that valid order upon defendants' claims herein.

With respect to the other question involved and considered by Judge Dooling, to wit, that of fraud, I am constrained to agree with him that at this time, and in the advance of a trial upon the merits, that issue is not so free from doubt as to justify this court upon that ground in taking the property of the defendants out of their possession and giving it over into the hands of an officer of the court.

[1] Referring to the facts pleaded as affecting defendants' rights under the withdrawal order, it may be stated generally that no discovery of oil was made on the property involved in the McCutchen Case prior to June 6, 1910, at which date a discovery was made, and oil and gas were produced by defendant Pacific Midway Oil Company. This discovery and production of oil was made under and pursuant to an oil placer location upon the premises in question, of date February 12, 1909, or possibly prior thereto. Under that location the Obispo Oil Company, as assignee of the locators of the land in controversy, entered upon the lands on or about March 1, 1909, and began active operations in the matter of drilling for oil. After a well had been drilled several hundred feet it was found impossible to continue the operations thereat, whereupon the rig was moved, and a new well was started. Thereupon a second well was drilled to a depth of almost 500 feet, when, some time during the month of July, 1909, the company having exhausted all of its available funds, the work was discontinued. On August 31, 1909, the committee appointed by the stockholders of the company at a meeting held on the 30th day of July reported that on August 5th they had visited Maricopa and had secured an agreement from the McCutchen brothers (the original locators hereinabove referred to) that the company might have an extension of 90 days, during which to make arrangements to continue drilling operations. The committee further reported that they had discharged the employés, had shut down the well, and left the properties

in charge of a keeper at a salary of $65 for the balance of the month of August. Some time in September a house on the land was oc-- cupied by a caretaker, who continued thereon, without salary, until March, 1, 1910. The Obispo Company never resumed work on the claim. Some time during the latter part of February following, the Pacific Midway Oil Company, as an assignee or successor in interest of the Obispo Oil Company, began operations on the property.

The two old wells hereinabove referred to were examined by the Pacific Midway Company, and after some experimentation were found ·unserviceable, whereupon the drilling rig was moved, and a third and entirely new well was started. This was in March, 1910. The work was pushed forward with diligence, and a discovery of oil was made by the medium of such well on June 5, 1910. Thereafter other companies, referred to in Judge Dooling's opinion, went upon the property and after some large expenditures of money produced oil in paying quantities. In this connection it may be suggested that upon the refusal by the land office, as hereinabove referred to, to issue a patent to the Pacific Midway Oil Company, an opinion was rendered, and from such opinion, containing a statement of the facts involved, the foregoing summary has been taken. This I do, not that I feel that the court is bound, in this proceeding, by the findings of fact of the land department of the government, but because of my belief that the facts as stated in said opinion are in accordance with the truth of the controversy.

With reference to the situation existing on the date of the presidential withdrawal order of September, 1909, it may be said that, in addition to the facts as stated by the Commissioner of the General Land office in his opinion, one of counsel for the defendants in his brief says:

"The care-taker had been in the employ of the Obispo Oil Company, and was then working on an adjoining piece of property, and lived, with his family, on this property, rent free, and with the assurance of further employment when operation should be resumed."

Another counsel, in the brief used before the land department and also presented to the court herein for its consideration, said with reference to the transactions occurring on and about the date of the withdrawal order:

"The continued active operations of the Obispo Company embraced a period from February, 1909, to August 5th. During this period they drilled well No. 1 to a depth of 500 feet, when they encountered shift boulders, which crushed the pipe. Then they moved the rig a short distance away and started drilling. In this they reached a depth of 470 feet, when operations were suspended—August 5, 1909—by reason of financial difficulties. On this date a committee of stockholders of the Obispo Company visited the ground. Up to this time there had been expended by the Obispo Company somewhere between $15,000 and $18,000 on this venture. The committee ordered the operations stopped, put Watterson, one of the drillers, in charge to take care of the property, at a salary of $65 per month, and secured from McCutchen brothers, by W. C. McCutchen, an agreement permitting a suspension of drilling for 90 days. * * * At this time, and subsequent to September 10, 1909, a man by the name of May and his wife moved into the house on the quarter, at the instigation of the Obispo Company, to hold possession of the property. Watterson, who had been employed by the committee of the Obispo stockholders, left about September 9th. The Mays were simply holding pos-

session by residence on the ground, but were not paid employés. May was subsequently employed when operations were resumed by the Pacific Midway. * * * It is conceded that between August 5, 1909, and until operations were resumed by the Pacific Midway in February 1910, there was no active drilling upon the property. From August 5 until September 10, 1909, Watterson was in possession as an employé of the Obispo. Thereafter May and his wife moved in *for the purpose of holding possession.* No salary was paid them, but they entered into possession *simply to hold it for the Obispo Company.*" (Italics mine.)

By a reference to the decision of the Supreme Court in the Midwest Case, supra, it will be observed that, though the presidential order of withdrawal of September 27, 1909, purported to withdraw from all forms of location or settlement under the mineral or nonmineral public land laws all the public lands specifically referred to in the lists accompanying the withdrawal order, yet this important exception was ingrafted upon that order, viz.:

"All locations or claims *existing and valid* on this date may proceed to entry in the usual manner after filing, investigation, and examination." (Italics mine.)

It is obvious that it was not and could not have been the intention of the President, acting for and in behalf of his principal, the United States government, to except from the operation of the withdrawal order all claims or locations that might then be subsisting upon lands included within such order. Special pains were taken to indicate that the intention of the executive was that only *"valid"* locations or claims were to be excepted from the general operation of the withdrawal order. In order to ascertain the extent of this exception it is necessary to define what, under the law, and within the meaning and true intent of the presidential action, constitute a *"valid"* location or claim. In this behalf it should be remembered that "valid" is defined as:

"Good or sufficient in point of law; efficacious; incapable of being rightfully overthrown or set aside; sustainable and effective in law, as distinguishable from that which exists or took place in fact or appearance, but has not the requisites to entitle it to be recognized and enforced by law." Cent. Dict.

What constitutes a "valid" mineral oil location, one "sustainable and effective in law," is very succinctly stated by the Supreme Court of California in McLemore v. Express Oil Co., 158 Cal. 559, 561 et seq., 112 Pac. 59, 60 (139 Am. St. Rep. 147). It is therein stated:

"The principle has become axiomatic that discovery and appropriation are the source of title to mining claims, and that assessment or development work is the condition of their continued possession. * * * But this rule applies only when the location is valid and complete. And a location is valid and complete only when, after compliance with other requirements, a discovery of valuable minerals in place has been made. In the case of ordinary minerals, little or no difficulty has been experienced by the courts in this matter. In practice, the miner went upon the public domain, and, before he took the trouble to stake his claim and post and record his notice, he made discovery. The staking of the boundaries of the claim and the posting of notice followed such discovery. When, however, Congress enacted that locations could and should be made of public lands containing petroleum or other mineral oils under the laws relating to placer mining claims (Act Feb. 11, 1897, 29 Stat. at Large, c. 216, p. 526 [U. S. Comp. Stats. 1901, p. 1435]), the courts were at

once confronted with serious difficulty in their endeavor to obey the congressional mandate, and fit the placer mining laws to the exigencies of oil locations which, in their nature, were radically dissimilar. Thus, it is well established, that the sole power of disposition and control of the public lands being vested by the Constitution of the United States on Congress (Const. U. S. art. 4, § 3), Congress could at any time change its policy in regard to those lands so long as vested rights were not impaired. It was fully established, also, that a qualified person, who had made a valid location upon a part of the public mineral domain (which valid location always, of course, includes discovery), acquired vested rights, which no change in congressional policy could affect or impair, but, per contra, that *'a change in policy could impair the rights of one upon the public domain who had not acquired a valid location.'* As has been said, in the case of other minerals, discovery preceded the demarkation of the boundaries, the posting and recording of the notice. In the case of oil, discovery, in the very nature of things, would rarely or never be made, except at the end of much time and after the expenditure of much money; the discovery of oil involving the erection of a derrick, the installation of machinery, and the laborious drilling of a well, frequently to the depth of 3,000 feet or more. If, therefore, the placer mining laws, which were declared by Congress to be the only laws under which oil locations could be established, were to be made of any practical benefit to the oil locator, it must be by permitting him to mark the boundaries of his location and post and record his notice, and *by protecting him in possession while he was with diligence prosecuting the labor of digging his well to determine whether or not a discovery could be made.* So it was held by the federal courts, by the courts of some of the other states, and by this court in Miller v. Chrisman, 140 Cal. 447, 73 Pac. 1084, 74 Pac. 444, 98 Am. St. Rep. 63, to the following effect: 'One who thus in good faith makes his location, remains in possession, and with due diligence prosecutes his work toward a discovery, is fully protected against all forms of forcible, fraudulent, surreptitious, or clandestine entries and intrusions upon his possession. Such entry must be always peaceable, open, and above board, and made in good faith, or no right can be founded upon it.' Weed v. Snook, 144 Cal. 439, 77 Pac. 1023; Cosmos, etc., Co. v. Gray Eagle Oil Co. (C. C.) 104 Fed. 20; Id., 112 Fed. 4, 50 C., C. A. 79 [61 L. R. A. 230]; Id., 190 U. S. 301, 23 Sup. Ct. 692 [24 Sup. Ct. 860, 47 L. Ed. 1064]; Whiting v. Straup, 17 Wyo. 1 [95 Pac. 849] 129 Am. St. Rep. 1093; Moffat v. Blue River, etc., Co., 33 Colo. 142, 80 Pac. 139. But it is always to be borne in mind that, until the perfection of the inchoate and incomplete location by discovery, the locator has, first, no vested rights which Congress is obliged to recognize. So that Congress may change its policy in regard to the lands to the extent even of excluding therefrom the diligent operator who has not made discovery. However inequitable such a proceeding might be, it in no way would be illegal. * * * What the attempting locator has is the right to continue in possession, undisturbed by any form of hostile or clandestine entry, *while he is diligently prosecuting his work to a discovery.* This diligent prosecution of the work of discovery does not mean the doing of assessment work. It does not mean the pursuit of capital to prosecute the work. It does not mean any attempted holding, by cabin, lumber pile, or unused brick. *It means the diligent, continuous prosecution of the work, with the expenditures of whatever money may be necessary to the end in view.*" (Italics mine.)

The gist of this decision, as I read it, is that after entry, and the initiating of the mineral placer claim by the oil locator, he has no vested right as against the government until he makes a discovery of oil upon the lands in question. In other words, the posting or recording of his oil placer claims gives him no rights as against the government until by discovery of oil it is made apparent that the land is in truth and in fact mineral land and subject to location under the mineral law. Having, however, initiated his claim by the posting of his notices, he is

protected as against third persons as long as he "remains in possession and with due diligence prosecutes his claim toward a discovery." As long as he thus conducts himself, though as against the government he has no vested rights, nevertheless he has rights which ought to be by all parties respected.

And, in this spirit, all locators who were thus conducting themselves at the time of the making of the withdrawal order had their rights respected by the President by the exception contained therein and hereinabove referred to; that is to say, on the date that the withdrawal order was made, if any locator was then on withdrawn lands, in possesssion, and was "with due diligence" prosecuting his work toward a discovery of oil, by the express provisions of the withdrawal order, it did not affect him. He had a "valid" location, and he could, despite the general terms of the order, "proceed to entry in the usual manner"; that is, proceed to a discovery and thereby perfect his right to the mineral claim. If, however, at the date of the withdrawal order, such locator was not in possession, or was not with "due diligence" prosecuting his work toward a discovery, then he had no "valid" location, and in virtue of the efficacy of the withdrawal order as an act of a duly authorized agent of the United States government in that behalf, the order served to withdraw from further entry, location, settlement, or other disposal the land so claimed by such locator. Furthermore, if, notwithstanding such situation, such locator, conceiving the withdrawal order to be entirely invalid, thereafter began or resumed operations looking to a discovery of oil upon his claim, he was met by the terms of the order itself, to the effect that the land was no longer open to entry or claim, and that, as between him and the government, all subsequent efforts of his could not serve to divest the government of its proprietary title therein.

The Supreme Court having determined, after most careful consideration, that the withdrawal order in question was valid in its every aspect, and effectual as serving to withdraw from entry or settlement the public lands referred to therein, it indubitably follows that any entry made or claim initiated upon such land so withdrawn subsequent to the date of such withdrawal order, and while the same was in full force and effect, would be void and futile as against the proprietary rights of the United States government. If discoveries of oil were made subsequent to the withdrawal order, in virtue of claims initiated, however, prior thereto, and if at the time of the making of such order the locators or their successors were in occupation of the property claimed, and were at that time diligently engaged in the prosecution of the work looking to a discovery of oil therein, they would be protected in their rights by the express terms of the withdrawal order itself. If they were not so engaged with diligence in endeavoring to effect a discovery of oil, then their rights would be no greater than, or different from, the rights of one who might have entered upon withdrawn lands subsequent to the date of the presidential order, and as to such an one the Supreme Court has said in the Midwest Case that his rights were nil.

In the Midwest Case, with respect to the validity of the withdrawal order, and as its ultimate conclusion thereon, the Supreme Court said:

"The long continued practice of acquiescence in Congress, as well as the decisions of the Courts, all show that the President had the power to make the order. And as was said in Wolsey v. Chapman, 101 U. S. 769·[25 L. Ed. 915], the 'withdrawal would be sufficient to defeat a settlement * * * while the order was in force.'"

In this connection it might be well to observe that the order remained in force until some congressional action or some other executive action annulled it. No congressional action was ever had in that behalf (Midwest Oil Case, supra), and no executive action, except in so far as the withdrawal order of July, 1910, served to ratify it.

[2] The claim seems to be made, and if I understand the opinion of the land department aright, is given recognition therein, that the scope or comprehensiveness of the withdrawal order of September, 1909, was in some wise affected or enlarged by the so-called Pickett Act, passed June 25, 1910. 36 Stat. 847. The Supreme °Court in the Midwest Case, supra, held that there was nothing in that act "indicating the slightest intent to repudiate the withdrawals already made under the executive order of September, 1909." The court also said that:

"The legislative history of the statute shows that there was no such intention and no purpose to make the act retroactive or to disaffirm what the agent in charge had already done."

It would seem to me that since the act in question was passed some months after the promulgation of the executive order, and it having been held by the Supreme Court not to have been in any degree an impairment of that order, the conclusion ought to follow that the act in no wise or at all affects the scope or purpose of the order. If it have any effect at all, however, it is, in my judgment, in support of the conclusions hereinabove announced by me with respect to the general effect of the withdrawal order. This follows because by the terms of the act itself it is provided that:

. "The rights of any person who at the date of any order of withdrawal heretofore * * * made is a bona fide occupant or claimant of oil or gas bearing lands, and who at such date is *in diligent prosecution of work* leading to discovery of oil or gas, shall not be affected or impaired by such order, *so long as such occupant or claimant shall continue in diligent prosecution of said work.*" (Italics mine.)

If this provision amounts to anything at all, it is tantamount to a declaration on the part of Congress itself to the effect that one who would claim the benefit of a location initiated previous to the promulgation of the withdrawal order, but not followed by a discovery until after the order, must have been, at the date of the withdrawal order, in diligent prosecution of work leading to a discovery of oil, and must have continued in such diligent prosecution until a discovery was effectuated.

[3] If I am correct in my views of the law as hereinabove declared, the claims of the defendants in the Kinsey and Midland Oilfields Company Cases, having been initiated subsequent to the promulgation of the withdrawal order of 1909, have no force or validity as against the holder

of the paramount title, the government, and defendants' intrusion into, and trespass upon, the lands covered by such claims, stand without warrant; in consequence their further waste thereof should be enjoined, and the operation of the oil properties thereon should be committed to the hands of a receiver of this court pending a final judgment quieting complainant's title thereto.

With respect to the questions involved in the McCutchen Case I find much greater difficulty in arriving at a conclusion satisfactory to myself. I am persuaded that if, under the law as stated, the Obispo Company had not a "valid" location at the date of the withdrawal order of 1909, then the subsequent efforts of their successors and assignees could not and should not be permitted to create a title to, or valid claim upon, withdrawn land. The real difficulty in the case, in this behalf, centers around a determination of the question as to whether or not the Obispo Company was "with due diligence" prosecuting its work toward a discovery of oil on its placer claim at the time of the promulgation of the withdrawal order. The land department, in the opinion hereinbefore referred to, has held that it was not prosecuting its work with due diligence at that time, and that in consequence its claim was not valid. This conclusion of that department, confessedly, is not binding upon the court, and perhaps it ought not to be at all persuasive with it. After a very careful consideration of the facts, however, as adduced from the record, and as admitted by counsel, and indicated hereinabove, I can come to no other conclusion than that the Obispo Oil Company was not prosecuting its work towards a discovery of oil with due, or even any, diligence at the time of the withdrawal of its land.

Recurring to the facts in the case, it will be remembered that the company, because of a visit of its stockholders to the ground, and *because all of its available funds were exhausted,* discontinued and actually ceased work looking to a discovery of oil on or before the 5th day of August, 1909, almost 60 days previous to the promulgation of the withdrawal order. It thereupon secured an extension of time under its contract with the original locators of the land, within which it might delay a resumption of operations. This extension of time lasted until November 5, 1909, but nothing was done on the property at that time, nor until more than three months thereafter. It further appears that the committee of stockholders discharged the employés and left the property in charge of a keeper under salary for a very short time. Thereafter a man, working on an adjoining piece of property, at the instigation of the Obispo Company, moved onto the property and lived there, rent free, *"simply to hold it for the Obispo Company."* Upon this state of facts it would seem to me as if the court, upon the trial, would be compelled, indubitably, to indulge in the conclusion as a matter of law that no due diligence looking to a discovery of oil upon the property was evident, either at the date of the withdrawal order or for some months subsequent thereto. McLemore v. Express Oil Co., 158 Cal. 559, 112 Pac. 59, 139 Am. St. Rep. 147; Borgwardt v. McKittrick Oil Co., 164 Cal. 650, 130 Pac. 417; Ophir Silver Mining Co. v. Carpenter, 4 Nev. 534, 97 Am. Dec. 550.

The point is made and urged with much force that it should not be held that the Obispo Company was lacking in diligence at the date of the withdrawal order, because they had theretofore expended a sum of approximately $20,000 in an endeavor to make a discovery of oil on the lands in question, and it is apparently insisted that that expenditure in itself is amply sufficient to refute the claim of a want of diligence. It should be remembered, however, with respect to this, that under the facts shown all efforts made by the Obispo Company in connection with the expenditure mentioned were fruitless, and the wells attempted to be sunk through such expenditure have actually, ever since on or about the 5th day of August, 1909, been abandoned, and if the defendants were given a clear title to all the land in question at this time, the expenditures made and relied upon herein by the Obispo Company would still constitute a false factor in their claim of title, because no muniment thereof would rest upon such expenditures. In other words, no discovery of oil at any time upon the premises in controversy in the McCutchen Case was made through, or by means of, or at a place developed by, the moneys laid out by the Obispo Company. When the Pacific Midway Oil Company, in the latter part of February, 1910, took over the rights of the Obispo Company and entered upon its property, it examined the wells theretofore sought to be sunk to the oil sands by the Obispo Company, but found them upon such examination wholly unserviceable, and actually sunk the wells which resulted in the discovery of oil at a different place. In this wise it may be said, as I view the situation, that the expenditures of the Obispo Company as heretofore indicated contributed in no degree or respect to the discovery of oil, and should not now be held as evidence of due diligence at the time of the promulgation of the withdrawal order.

In somewhat similar vein it is also urged that it would be highly inequitable now for the government to retake the title, so to speak, of these lands, after the defendant companies have gone upon them and made the expenditures of hundreds of thousands of dollars in the prosecution of work leading to a discovery and extraction of oil shown here by the facts. The simple and sufficient answer, however, to this contention, is that all of these defendants went upon these lands at a time when they knew that they had been withdrawn from entry and settlement by order of the President of the United States. If they relied upon a claim initiated previously to such withdrawal, it was their bounden duty, under the circumstances, to investigate and consider whether or not such claim was "valid," and therefore within the protective provisions of the executive order. What they did, then, in that state of the case, and in disregard of their duty to investigate, they must be held, and held rightly, to have done at their own risk. That they misconceived the law, and determined in their own minds that the withdrawal order of 1909 was invalid, does not suffice, in the judgment of this court, to secure for them any rights because of the expenditure made under such misconception. The government of the United States did nothing to lead them to believe that the withdrawal order was invalid, and to hold that a party may deliberately refuse to

recognize a valid executive order, and thereby and because of such refusal profit himself, is to put at once a premium upon disregard of law and constituted authority, and make it the rightful privilege of every one to misconceive and disregard the law, if in so doing he will thereby advantage himself. I cannot believe such to be a safe or salutary rule, and in consequence feel that there are no equities of any sort or nature inuring to the benefit of those who now claim rights in these public lands merely because of their disregard of the presidential order of withdrawal thereof, and because of their financial ability and willingness thereafter to prosecute to a successful conclusion a discovery of minerals thereon.

The contention is urged in the McCutchen Case that a receiver should not at this time be appointed because of the fact that Judge Dooling has heretofore refused to make such appointment, and the claim is made that there is no change in the situation now from what it was at the time of the action of Judge Dooling. Waiving all other considerations, however, it may be said that the last premise is not well taken. There are two changes in respect of the situation, differentiating it from that contemplated by Judge Dooling. In the first place, the withdrawal order which Judge Dooling held to be invalid has since been declared entirely valid by the highest court in the land. In the second place, and of more than slight importance, in my judgment, the land department of the government, for reasons entirely satisfactory to itself, no doubt, has refused to grant a patent to the defendants to the precise lands in dispute. While this fact alone would not, in my judgment, authorize or justify the appointment of a receiver by this court at this time, nevertheless it may be taken into account in determining whether or not, in view of the changed situation, plaintiff may not be entitled to renew his application.

[4] The point is also made that the government, being out of possession, is not entitled to a receivership in advance of a judgment in its favor in an action at law, awarding to it the possession of the various premises in controversy. Owing to the rapidity, however, with which the very substance of plaintiff's property is being wrongfully, as I view it, depleted, it is obvious that to deny plaintiff the provisional relief it seeks of this court at this time, until it should, perchance, have been victorious in an action at law, would be most successfully to deprive it of all the substantial fruits of the victory which that selfsame action at law would secure. If plaintiff is possessed of any rights in and to these properties, it is entitled to assert them now, because, in view of the continuous extraction of oil—the only valuable element of the properties—the mere lapse of time in itself would suffice to deprive plaintiff of its valuable and most substantial rights in their entirety. As is said in 34 Cyc. p. 17, the appointment of a receiver is made by a court of equity, in the performance of one of its prerogative functions, in order to enable the court to accomplish, as far as practicable, complete justice between the parties.

Assuming, as I am led to assume, the ownership of and right to the products of the lands in controversy herein by the government of the United States, there would seem to be no doubt, in order, under

the circumstances, that complete justice may be done as between the government on the one hand and the defendants on the other, that receivers should be appointed, and injunctions in restraint of waste should be awarded, as the same have been prayed for.

Appropriate orders, embodying these conclusions, will be drafted by the government's counsel.